**Earl FORSYTHE, Plaintiff,**

v.

**NEW YORK CITY DEPARTMENT OF CITYWIDE ADMINISTRATIVE SERVICES, Defendant.**

**No. 08 Civ. 10151(FM).**

United States District Court, S.D. New York.

July 13, 2010.

Earl Forsythe, New York, NY, pro se.

Jason Aaron Kroll, New York City Law Department, David A. Mintz, Weissman & Mintz LLC, New York, NY, for Defendant.

### DECISION AND ORDER

FRANK MAAS, United States Magistrate Judge.

I. *Introduction*

*Pro se* Plaintiff Earl Forsythe ("Forsythe") brings this employment discrimination action against the New York City Department of Citywide Administrative Services ("DCAS"). Forsythe alleges that DCAS and its employees discriminated against him on the basis of his race, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), while he was employed by Tristar Patrol Services ("Tristar") as a security guard at various properties owned by the City of New York ("City"). Following the close of discovery, DCAS moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Docket No. 37). For the reasons set forth below, that motion is granted.[1]

1. On November 23, 2009, the parties consented to my exercise of jurisdiction over this case

II. *Facts*

Unless otherwise indicated, the following facts are either undisputed or set forth in the light most favorable to Forsythe.

A. *Contract Between Tristar and the City*

Between 2002 and 2006, pursuant to a contract with the City, Tristar provided private security services for properties owned and managed by the City. (Plaintiff's Rule 56.1 Statement ("Pl.'s Stmt.") ¶ 4; Defendants' Rule 56.1 Statement ("Def.'s Stmt.") ¶ 4). Included among these sites were properties operated by DCAS and properties operated by the City's Department of Transportation ("DOT"). (Pl.'s Stmt. ¶¶ 4, 36–37; Def.'s Stmt. ¶¶ 4, 36–37). At each site covered by the contract, Tristar employed an "on-site supervisor" to oversee the rest of the company's employees. (Pl.'s Stmt. ¶ 7; Def.'s Stmt. ¶ 7). The contract afforded the City agencies the right to "reject and bar" any Tristar employee from a facility, and to "require the immediate removal of any security guard failing to meet contract requirements or for nonperformance." (Pl.'s Stmt. ¶ 8; Def.'s Stmt. ¶ 8; Def.'s Ex. C).

The security guards employed by Tristar assigned to DCAS facilities were required to follow a dress code. (Pl.'s Stmt. ¶ 28; Def.'s Stmt. ¶ 28). Indeed, Tristar's contract with the City required Tristar to provide a uniform for each of its guards. (Pl.'s Stmt. ¶ 9; Def.'s Stmt. ¶ 9). The dress code mandated that the guards' uniforms be "clean and complete while on duty," and that "a guard's appearance must also be neat, which includ[ed] shined shoes and neatly groomed hair." (Pl.'s Stmt. ¶ 28; Def.'s Stmt. ¶ 28). DCAS also

for all purposes in accordance with 28 U.S.C. § 636(c). (Docket No. 29).

insisted that the guards at its sites, especially the Municipal Building at One Centre Street, "maintain a professional appearance" because the guards at those sites had "significant contact with the public." (Pl.'s Stmt. ¶ 29; Def.'s Stmt. ¶ 29).

### B. *Forsythe's Employment*

Forsythe, an African–American male, was employed by Tristar as a security guard from 2003 until 2006, when the company ceased doing business. (Pl.'s Stmt. ¶¶ 3, 10, 48; Def.'s Stmt. ¶¶ 3, 10, 48). While he was employed by Tristar, Forsythe worked at several different City-owned sites in Manhattan, some of which were managed by DCAS. Initially, Forsythe was stationed at 280 Broadway, where he worked from 10 a.m. to 6 p.m. (Pl.'s Stmt. ¶¶ 22, 23; Def.'s Stmt. ¶¶ 22, 23). At that location, Joe Bascillo ("Bascillo") eventually became Forsythe's Tristar on-site supervisor. (Pl.'s Stmt. ¶ 24; Def.'s Stmt. ¶ 24). At the request of Dan Kim ("Kim"), the Deputy Director of Security for DCAS's Division of Administration and Security, Forsythe subsequently was reassigned to work at One Centre Street. (Pl.'s Stmt. ¶ 25; Def.'s Stmt. ¶ 25). After the transfer, Forsythe continued to work the same shift. (Pl.'s Stmt. ¶ 26; Def.'s Stmt. ¶ 26). Bascillo later became the Tristar on-site supervisor at One Centre Street. (Pl.'s Stmt. ¶ 27; Def.'s Stmt. ¶ 27).

In late November 2005, when Forsythe reported to his post at One Centre Street, Bascillo informed him he had been transferred to a DOT parking lot ("DOT lot") located between the Brooklyn and Manhattan Bridges. (Pl.'s Stmt. ¶¶ 36–37; Def.'s Stmt. ¶¶ 36–37). Although Forsythe remained a Tristar employee and his pay did not change, following the transfer he was required to work from 7 a.m. to 3 p.m. instead of his previous shift of 10 a.m. to 6 p.m. (Pl.'s Stmt. ¶ 37; Def.'s Stmt. ¶ 37). After less than two weeks, Forsythe arrived at the DOT lot and found another Tristar guard covering his shift. (Pl.'s Stmt. ¶ 38; Def.'s Stmt. ¶ 38). Forsythe therefore returned to One Centre Street and was posted at the south side of the building. (*Id.*). When Kim saw him there, he asked, "What are you doing in the building?" (Pl.'s Stmt. ¶ 39; Def.'s Stmt. ¶ 39). Minutes later, after Kim left the lobby, Bascillo ordered Forsythe back to the DOT lot, instructing him to send the security guard working that post to One Centre Street. *Id.* Forsythe testified at his deposition that the guard who replaced him "may" have been "of African descent" and that his skin color was black. (Def.'s Stmt. ¶ 40; Forsythe Dep. 114:20–115:6). In his motion papers, however, Forsythe claims he was replaced by an Hispanic man named Edwin Almastica. (Pl.'s Stmt. ¶ 40; Pl.'s Mem. Ex. D).

Some time after Forsythe was sent back to the DOT lot, Tristar transferred him to 31 Chambers Street, a DCAS-managed site, where he worked only one day. (Pl.'s Stmt. ¶ 42; Def.'s Stmt. ¶ 42). Thereafter, Jeff Bermudez ("Bermudez"), the Tristar Area Supervisor, transferred Forsythe to 364 Broadway, another DCAS-managed site, where he was assigned to the night shift for several months.[2] (Pl.'s Stmt. ¶¶ 43–45; Def.'s Stmt. ¶¶ 43–45). Around Christmas 2005, Tristar transferred Forsythe to a DOT site in Queens, where he was assigned to the 3 to 11 p.m. shift. (Pl.'s Stmt. ¶¶ 46–47; Def.'s Stmt. ¶¶ 46–47). Forsythe continued to work for Tristar until the company ceased operations in December 2006. (Pl.'s Stmt. ¶ 48; Def.'s Stmt. ¶ 48).

---

**2.** The Court takes judicial notice that the first five sites to which Forsythe was assigned are located relatively close to each other in lower Manhattan. *See* Fed.R.Evid. 201(b).

As of the date this suit was filed, Forsythe was employed as a security guard by Tristar's successor on the City contract, Allied Barton, Inc. (Forsythe Dep. 47:5–8). Subsequently, Forsythe no longer was able to work for Allied Barton. Allied Barton remained willing to employ Forsythe, but he lost his alien identification card, a document required in order to secure the Coast Guard identification card that he needs to perform the work that Allied Barton has available. (Forsythe Dep. at 51, 53–54).

Forsythe's 10 a.m. to 6 p.m. shift at One Centre Street allowed him to pick up his son from the school in Chinatown he attended. (Forsythe Dep. at 105). Forsythe's transfer to the DOT lot in lower Manhattan "disrupted" this schedule, however, because Forsythe was required to work from 7 a.m. to 3 p.m. (*Id.*). Forsythe testified that once he began working the 3 p.m. to 11 p.m. shift at the Queens DOT site he no longer was able to see his son because he was required to work during his son's after-school hours. (*Id.* at 153:24–154:13). Forsythe testified further that his son's mother could not take their son to school because the child was reluctant to go with her. (*Id.* at 149:12–149:14). As part of his papers opposing DCAS's present motion, Forsythe also has submitted medical records to support his claim that his son is asthmatic and therefore in need of additional parental care. (Pl.'s Mem. Ex. C–2).

## III. *Procedural History and Claims*

After Forsythe filed an administrative complaint against Tristar and DCAS, the EEOC issued a "right to sue letter" on September 30, 2008. (*See* Compl. Attachs.). Forsythe then timely commenced this lawsuit against DCAS in late 2008. (*See* Compl. at 1). In January 2009, Forsythe filed an amended complaint in which, in addition to DCAS, he named as defendants both Allied Barton and Local 32 BJ

of the Service Employee's International Union, Forsythe's then-union. The amended complaint asserted both a discrimination claim and ERISA claims related to Forsythe's medical coverage and the payment of his son's health care bills. (Am. Compl. (Docket No. 7) at 2–3).

In response to the City's motion to dismiss the amended complaint as against DCAS, Forsythe submitted a letter and affirmation indicating that he wished to abandon his amended complaint and proceed solely on the discrimination claim against DCAS in his original complaint. Accordingly, by Decision and Order dated April 6, 2009, Judge McMahon, to whom this case then was assigned, directed that Forsythe's "original complaint be reinstated" and that his amended complaint be deemed withdrawn. (*See* Docket No. 17 at 2). Judge McMahon also denied the City's motion to dismiss the claims against DCAS pursuant to Rule 12(b)(6), reasoning that whether the City was a dual employer and whether Forsythe had suffered an adverse employment action as a consequence of his transfer were issues that could not be resolved without some discovery. (*Id.* at 4).

As a consequence, DCAS is the only remaining defendant in this action and race discrimination in violation of Title VII is Forsythe's only claim. Forsythe contends that Kim caused him to be transferred from his post at One Centre Street and later banned him from all DCAS-managed buildings because of his race. (Compl. ¶ 5). Forsythe further asserts that Kim "only had [A]frican [A]merican officers banned from DCAS" and that "white, [H]ispanic and [A]sian officers were not subjected to this demeaning treatment." (*Id.* ¶ 6).

## IV. *Discussion*

### A. *Standard of Review*

Under Rule 56(c)(2) of the Federal Rules of Civil Procedure, summary judg-

ment is appropriate only when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c)(2).

In deciding a motion for summary judgment, the Court must "view the evidence in the light most favorable to the party opposing summary judgment and must draw all permissible inferences" in favor of that party. *Harris v. Provident Life and Accident Ins. Co.,* 310 F.3d 73, 78 (2d Cir.2002); *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir.1997). The Court also must accept as true the non-moving party's evidence, if supported by affidavits or other evidentiary material. *See Beyer v. County of Nassau,* 524 F.3d 160, 164 (2d Cir.2008). Assessments of credibility, choosing between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the Court. *Fischl,* 128 F.3d at 55; *see also* Fed.R.Civ.P. 56(e) 1963 advisory committee's note. Thus, "[t]he court's function is not to resolve disputed issues of fact but only to determine whether there is a genuine issue of material fact to be tried." *Fischl,* 128 F.3d at 55.

To defeat a motion for summary judgment, the non-moving party cannot simply rely upon allegations contained in the pleadings that raise no more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, the nonmoving party must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

█ Although the same summary judgment rules apply to a party proceeding pro se, special latitude is appropriate to ensure that a meritorious claim is not foreclosed simply because the papers submitted in opposition to the motion are inartfully worded. *See Milano v. Astrue,* No. 05 Civ. 6527(KMW)(DCF), 2009 WL 1150186, at *1 n. 1 (S.D.N.Y. April 29, 2009); *see also Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (*pro se* complaint should be held to less stringent standard than formal pleadings drafted by counsel); *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (pleadings should be read liberally and interpreted to "raise the strongest arguments that they suggest") (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). By the same token, however, a *pro se* party's "bald assertion, completely unsupported by evidence," is not sufficient to overcome a motion for summary judgment. *Pointdujour v. Mount Sinai Hosp.,* 121 Fed.Appx. 895, 898 (2d Cir.2005) (quoting *Carey v. Crescenzi,* 923 F.2d 18, 21(2d Cir.1991)).

### B. *Existence of an Employment Relationship*

█ A Title VII action ordinarily may be maintained only against a plaintiff's employer. *See* 42 U.S.C. § 2000e-2(a). There are two exceptions to this rule. First, under the "single employer doctrine" doctrine, liability may be found "when two nominally separate entities are actually part of a single integrated enterprise." Second, under the "joint employer doctrine," liability may be found when "separate legal entities have chosen to handle certain aspects of their employer-employee relationships jointly." *Lima v. Addeco,* 634 F.Supp.2d 394, 400 (S.D.N.Y. 2009) (quoting *Arculeo v. On–Site Sales & Mktg., LLC,* 425 F.3d 193, 198 (2d Cir. 2005)) (internal quotation marks omitted);

*see also N.L.R.B. v. Solid Waste Services. Inc.*, 38 F.3d 93, 94 (2d Cir.1994) (An action may nevertheless be maintained when a joint employer relationship exists because the named entity had "immediate control over the other company's employees.").

■ Here, there is no suggestion that DCAS and Tristar operate as a single enterprise. Moreover, Forsythe concedes that Tristar, not DCAS, was his direct employer at the time the alleged discriminatory acts occurred. (Pl.'s Stmt. ¶¶ 1, 10–15; Def.'s Stmt. ¶¶ 1, 10–15). Accordingly, Forsythe can prevail, if at all, only on a "joint employer" theory. Among the factors courts consider in determining whether a joint employer relationship exists are, "commonality of hiring, firing, discipline, pay, insurance, records, and supervision." *Lima*, 634 F.Supp.2d at 400.

■ Forsythe does not dispute that Tristar had complete control over certain aspects of his employment, including the processing of his employment application, the issuance of his Tristar uniform, the processing of his paychecks, and his employee benefits. (Pl.'s Stmt. ¶¶ 11, 13, 15; Def.'s Stmt. ¶¶ 11, 13, 15). Forsythe also concedes that a collective bargaining agreement (to which DCAS was not a party) existed between his union and Tristar. (Pl.'s Stmt. ¶¶ 19–20; Def.'s Stmt. ¶¶ 19–20). Forsythe further admits that Bascillo and Bermudez, both of whom were Tristar employees, were the individuals who advised him of his site transfers. He nevertheless contends that, through its contract with Tristar, the City retained the ability to make staffing decisions for Tristar security guards working at DCAS-managed sites, and that DCAS employees actually made those decisions, even if Tristar employees were the persons who executed the transfer orders. (Pl.'s Stmt. ¶¶ 16–17; Pl.'s Ex. A–1 at 24).

Insofar as relevant, the agreement between the City and Tristar states that DCAS "reserves the right to reject and bar from the facility any employee hired by [Tristar]." (Pl.'s Ex. A-1 at 24; Def.'s Ex. C at 24). Additionally, the City apparently concedes that it was "within [Kim's] authority as Deputy Director of Security for DCAS's Division of Administration and security to make requests for a Tristar security guard to be transferred to or from DCAS-managed sites." (Kim Decl. ¶ 16). DCAS therefore clearly had some measure of control over the supervision of Tristar-employed security guards.

Kim contends, however, that he never requested that Forsythe be removed from One Centre Street or any other DCAS-managed site. (*Id.*). Additionally, Bermudez agrees that Kim never informed him that Forsythe was banned from any facility or directed that Forsythe be removed from One Centre Street. (Bermudez Decl. ¶ 7). Nevertheless, Bermudez concedes that he does not recall who at Tristar allegedly made the decision to transfer Forsythe from One Centre Street. (*Id.* ¶ 8). Bascillo, who was Forsythe's direct supervisor at One Centre Street, similarly states that he "do[es] not recall" Kim banning Forsythe from One Centre Street or other DCAS-managed sites, but does not deny that this may have occurred. (Bascillo Decl. ¶ 10).

Conversely, Forsythe has submitted the declaration of Kyle Jiggetts, another former Tristar employee, who states that Bascillo told him that "Kim didn't want . . . Forsythe working at [One] Centre Street." (Jiggetts Decl. at 1). Moreover, Forsythe has testified that when he returned to One Centre Street from the DOT lot, Kim challenged his presence and left the lobby. (Forsythe Dep. at 112–13). Forsythe further testified that shortly thereafter Bascillo directed him to leave

One Centre Street and return to the DOT lot. (*Id.* at 105–06).

In sum, DCAS clearly had the ability to banish Forsythe from One Centre Street or other DCAS-managed sites. There is a factual issue, however, as to whether DCAS—through Kim—exercised that authority. If it did, a jury might be able to find DCAS liable on a joint employer theory if the transfer of Forsythe was racially motivated. The City therefore is not entitled to summary judgment on the theory that DCAS was not Forsythe's employer. The key issue consequently is whether Forsythe has raised a triable issue of fact regarding his Title VII discrimination claim.

### C.  *Title VII Claim*

Title VII provides that "[i]t shall be an unlawful employment practice for an employer ... to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1).

To overcome a motion for summary judgment, "a discrimination plaintiff must withstand the three-part burden-shifting laid out by *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–03, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *McPherson v. N.Y.C. Dep't of Educ.,* 457 F.3d 211, 215 (2d Cir.2006). Under that rubric, the plaintiff must satisfy an initial burden of "proving by a preponderance of the evidence a *prima facie* case of discrimination." *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). To establish a *prima facie* case, an employee must show that: (a) he was within the protected class; (b) his job performance was satisfactory; (c) he was subjected to an adverse employ-

ment decision or discharge; and (d) the adverse action occurred under circumstances giving rise to an inference of discrimination. *See Demoret v. Zegarelli,* 451 F.3d 140, 151 (2d Cir.2006); *Stratton v. Dep't for the Aging,* 132 F.3d 869, 879 (2d Cir.1997).

Once the plaintiff makes out a *prima facie* case, "a rebuttable presumption of discrimination arises and the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment decision." *Sharpe v. MCI Commc'ns Servs., Inc.,* 684 F.Supp.2d 394, 401 (S.D.N.Y.2010) (quoting *Stratton,* 132 F.3d at 879). The purpose of this step is "to force the defendant to give an explanation for its conduct, in order to prevent employers from simply remaining silent while the plaintiff founders on the difficulty of proving discriminatory intent." *Felder v. Securitcus Sec. Serv.,* No. 04 Civ. 9501(LAK), 2006 WL 2627969, at *7 (S.D.N.Y. Sept. 12, 2006) (quoting *Fisher v. Vassar Coll.,* 114 F.3d 1332, 1335–36 (2d Cir.1997) (*en banc* )).

Finally, if the defendant provides a nondiscriminatory rationale for its conduct, the rebuttable presumption drops out of the case. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 510–11, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). The burden then rests on the plaintiff to prove not only that the proffered nondiscriminatory reason was pretextual, but also that the defendant discriminated against the plaintiff. *Slattery v. Swiss Reinsurance Am. Corp.,* 248 F.3d 87, 93–94 (2d Cir.2001). In other words, the burden shifts back to the plaintiff to prove that "discrimination was the real reason for the employment action." *Graham v. Long Island R.R.,* 230 F.3d 34, 38 (2d Cir.2000).

#### 1.  *Prima Facie Case*

■ For the purposes of its present motion, DCAS concedes that Forsythe meets

two of the four required elements of a *prima facie* Title VII discrimination claim because he is an African–American male who was capable of performing his assigned job. (Def.'s Mem. at 9). To establish a *prima facie* case, Forsythe also must show that he suffered an adverse employment action and that his termination occurred under circumstances giving rise to an inference of discrimination. Here, even if Forsythe's many transfers qualify as an adverse employment action, he has not shown that he was transferred because of his race and therefore has not established a prima facie case.

### a. *Adverse Employment Action*

■ "A plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment." *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 639–40 (2d Cir.2000) (internal quotation marks omitted). "To be materially adverse a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.* In *Galabya*, the Second Circuit listed several actions that could be considered "materially adverse," including "a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [or] significantly diminished material responsibilities." *Id.* at 640. The Second Circuit emphasized, however, that this list is not exclusive and that "other indices ... unique to a particular situation," could be considered materially adverse. *Id.*

■■ Where the allegedly adverse action is an involuntary transfer, "the key inquiry ... is whether the transfer constitutes a negative employment action tantamount to a demotion." *Pacheco v. N.Y. Presbyterian Hosp.*, 593 F.Supp.2d 599,

617 (S.D.N.Y.2009). Generally, a change in shift time or location that is merely inconvenient does not rise to the level of an adverse employment action. *See, e.g., Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 128 (2d Cir.2004) ("If a transfer is truly lateral and involves no significant changes in an employee's conditions of employment, the fact that the employee views the transfer either positively or negatively does not of itself render the denial or receipt of the transfer an adverse employment action."); *Wilson v. New York City Dep't of Transp.*, No. 01 Civ. 7398(RJH), 2005 WL 2385866, at *16–*17 (S.D.N.Y. Sept. 28, 2005) (denial of request to change shift not an adverse employment action); *Booker v. Fed. Reserve Bank of N.Y.*, Nos. 01 Civ. 2290(DC), 01 Civ. 2291(DC), 2003 WL 1213148, at *11 (S.D.N.Y. March 17, 2003) ("Typically, lateral transfers or shift changes without a loss of pay or other material changes in working conditions do not constitute an adverse employment action."); *Johnson v. Eastchester Union Free Sch. Dist.*, 211 F.Supp.2d 514, 518 (S.D.N.Y.2002) ("Johnson identifies his new hours and job location to be very inconvenient for him. Inconvenience by itself, however, does not constitute an adverse job action.").

The Second Circuit, however, has not ruled out the possibility that a shift change could rise to the level of an adverse employment action. *See Little v. Nat'l Broadcasting Co.*, 210 F.Supp.2d 330, 377 (S.D.N.Y.2002) (noting that "a shift assignment that makes a normal life difficult for the employee" may constitute an adverse employment action). Indeed a judge in this District recently denied summary judgment, noting that "a transfer that affects a parent's ability to spend time with and care for a child" could, on a case by case basis, support a Title VII retaliation

claim. *Cruz v. Liberatore,* 582 F.Supp.2d 508, 524 (S.D.N.Y.2008).

■ In 2006, the Supreme Court held that a plaintiff can prove a retaliation claim under Title VII when "a reasonable employee would have found the challenged action materially adverse," such that "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *See Burlington Northern & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006). The anti-retaliation provision of Title VII, however, permits a plaintiff to recover based on actions not directly related to the terms and conditions of employment. *Id.* at 64, 126 S.Ct. 2405. It therefore is broader in scope than the language applicable to direct discrimination actions. *Id.*

The *Burlington* standard does not specifically apply to the instant action which alleges direct discriminatory action. Nevertheless, in its decision, the *Burlington* Court rejected the Sixth Circuit's application of the "adverse employment action" standard applicable to direct discrimination cases. *Id.* at 67–68, 126 S.Ct. 2405. Moreover, the standard articulated by the Supreme Court in *Burlington,* like the Second Circuit's "adverse employment action" standard, turns on a question of materiality. In *Burlington,* the Supreme Court emphasized, as had the Second Circuit in *Little,* that materiality is context specific. *Id.* at 69, 126 S.Ct. 2405 ("A schedule change in an employee's work schedule may make little difference to many workers, but matter enormously to a young mother with school-age children.").

In light of *Burlington* and *Little,* it is appropriate to consider context in deciding whether Forsythe suffered an adverse employment action.

■ Forsythe claims that his transfers from One Centre Street to the DOT lot in Manhattan, and ultimately to another DOT site in Queens, constituted adverse employment actions. He does not contend that he lost wages or otherwise was denied opportunities for promotion because of the transfers. Apparently, the only damages that he suffered were that his shift change severely disrupted his child care routine and ability to spend time with his son. As discussed above, an employment action that affects child care may, but does not necessarily, constitute an adverse employment action. Because this presents a triable issue of fact, the City is not entitled to summary judgment on the theory that Forsythe, as a matter of law, did not suffer an adverse employment action.[3]

#### b. Inference of Discrimination

Even if Forsythe's shift and location changes constituted adverse employment actions, he has failed to present evidence creating a triable issue of fact as to the final element of his *prima facie* case: that his "employer's adverse employment decision occurred under circumstances that raise an inference of discrimination." *Belfi v. Prendergast,* 191 F.3d 129, 140 (2d Cir.1999). In an effort to do so, Forsythe has submitted extensive opposition papers, but they fail to establish any racial motive for Forsythe's transfers.

At the outset, Forsythe concedes that it was Kim who initially ordered Forsythe's

---

**3.** In his Rule 56.1 statement, Forsythe claims that he was deprived of a $.75 per hour raise after Allied Barton took over the Tristar contract because he was no longer employed at a DCAS site and the raise applied only to guards at those sites. (Pl.'s Stmt. ¶ 41). This assertion is not supported by any documentary evidence. In any event, Allied Barton is not a defendant in this action which concerns the City's alleged actions during an earlier time period.

transfer to One Centre Street. (Pl.'s Stmt. ¶¶ 25, 28). While this is not dispositive, it certainly undermines Forsythe's assertion that Kim later transferred him from that location on the basis of a discriminatory motive. *See Schnabel v. Abramson*, 232 F.3d 83, 91 (2d Cir.2000) ("[W]here the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire.").

More importantly, there simply is no evidence that the decision to transfer Forsythe from One Centre Street, even if made by Kim, was racially motivated. Forsythe testified at his deposition that Kim took him to task on several occasions prior to the transfer because bicycles had been chained outside One Centre Street. (Forsythe Dep. 125–26). He also notes that Kim complained on one occasion that Forsythe was outside the building "drinking hot chocolate and talking to the vendor," apparently "accus[ing Forsythe] of not doing his job." (*See* Forsythe Mem.

(Docket No. 43) at 1). On another occasion, Kim apparently told him to "check how many pigeons were at One Centre Street" (Forsythe Dep. 125). Although Forsythe characterizes these acts as discriminatory, (*id.* at 125–26), there is nothing about any of them to suggest that Kim acted with a racial animus.[4]

Forsythe also notes that when he returned to One Centre Street after having been transferred to the Manhattan DOT lot, Kim asked him "What are you doing in the building?" He further observes that shortly thereafter Bascillo, a Tristar employee, ordered him to return to the DOT lot and to send the guard there to One Centre Street. (Pl.'s Stmt. ¶ 39; Def.'s Stmt. ¶ 39). Even if the Court were to assume that Bascillo acted on Kim's instruction, there is nothing about this event which suggests that Kim ordered the transfer back to the DOT lot out of racial animus.[5]

The only other assertion that Forsythe relies on in an effort to show that his

---

**4.** In his declaration, Kim avers that he often observed Forsythe at One Centre Street "without a tie, ... wearing pants that were too long," and that his "hair also was unkempt and his general appearance was unprofessional." (Kim Decl. ¶ 12; *see also* Def.'s Stmt. ¶ 30). Forsythe disputes this, contending that only his Tristar jacket was "worn out" and that he never was given a "written reprimand" about his uniform or appearance. (Pl.'s Stmt. ¶¶ 30–32). Here, again, even if Kim's criticisms were misplaced, they do not suggest a racial motivation.

**5.** Forsythe testified at his deposition that the guard who replaced him at One Centre Street was black and "may have been of African descent." (Def.'s Stmt. ¶ 40; Forsythe Dep. 114:20–115:6). In his Rule 56.1 statement, however, Forsythe contends that the person who replaced him was in fact a Hispanic man named Edwin Almastica.

It is settled law that "a party cannot create an issue of fact by submitting an affidavit in

opposition to summary judgment that contradicts prior deposition testimony." *See Gorzynski v. Jetblue Airways Corp.*, 596 F.3d 93, 104 (2d Cir.2010) (citing *Perma Research and Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir.1969)). Nevertheless, a party may explain deposition testimony, "particularly where [his] answers had not been clear or the questions posed to him had not been altogether unambiguous." *See United States v. Krieger*, 773 F.Supp. 580, 587 (S.D.N.Y.1991).

Forsythe has attempted to explain the contradiction in a subsequent submission to the Court. In his motion asking the Court to "move forward to a pre-trial order and trial," dated May 28, 2010, (Docket No. 41), Forsythe states "that an African American took over the back door post but a Hispanic [took his] detex perimeter schedule from 10 a.m. till 6 p.m." While it is unclear what a "detex perimeter" is, even this explanation apparently concedes that Forsythe was replaced, at least with respect to some of his duties, by another African American security guard.

transfer was racially motivated is that DCAS and/or Kim allegedly maintained a "ban list" which restricted the ability of Forsythe and the other African American security guards to work at DCAS-managed sites. (Compl. ¶¶ 2, 5). The only conceivable support for this claim is the declaration of Kyle Jiggetts, who states that Kim gave Bermudez a DCAS "ban list" comprised primarily of African–American guards. (Pl.'s Mem. Ex. D). Jiggetts also contends that shortly after Kim asked him whether he was Haitian, he noticed that "many Haitian guards were transferred from [One] Centre Street and replaced by [H]ispanic guards." (*Id.*). There is no indication, however, that Jiggetts ever saw the purported ban list or that Kim or Bermudez ever confirmed to him that it exists. Moreover, neither Jiggetts nor Forsythe has provided any evidence to support their conclusory assertion that the guards transferred from One Centre Street were disproportionately African American (or Haitian), much less that Kim or DCAS, rather than Tristar, caused them to be transferred.

In sum, Forsythe has not advanced any admissible evidence that his transfer from One Centre Street was based on his race. In the absence of such evidence, even if he were able to establish the other elements of a *prima facie* case, DCAS is entitled to summary judgment with respect to Forsythe's Title VII claim.[6]

### D. *Other Claims*

In his papers opposing DCAS's summary judgment motion, Forsythe raises several other claims relating to alleged contractual breaches. First, Forsythe alleges that Kim breached the City's contract with Tristar by asking that Forsythe be given a winter jacket. Forsythe reasons that because Kim was a former Tristar employee, he should not have asked Tristar for a jacket on Forsythe's behalf. (Pl.'s Mem. at 1). Forsythe also alleges that Tristar and the City breached their contract by permitting unqualified and untrained guards and supervisors to work at City sites. (*Id.* at 1–2). He further contends that he should not have been transferred from One Centre Street without the involvement of his union representative as required by the collective bargaining agreement between Tristar and the Allied International Union. (*Id.* at 2).

None of the claims appear in Forsythe's original complaint. Moreover, at an earlier stage of this case, Judge McMahon found that Forsythe had withdrawn his amended complaint and wished to "return to his original pleading, which alleged just one thing—employment discrimination—against just one defendant—the City." (Docket No. 17 at 2). To entertain claims other than Forsythe's Title VII claim after the close of discovery and the filing of the City's summary judgment motion obviously would be prejudicial to the City. Accordingly, the Court declines to consider these previously-abandoned claims at this late date. *See Cotz v. Mastroeni*, 476 F.Supp.2d 332, 373 (S.D.N.Y.2007) (citing *Mauro v. S. New England Telecomm., Inc.*, 208 F.3d 384, 386 n. 1 (2d Cir.2000)). I note that even if the Court were to reach Forsythe's additional claims, they would in

---

**6.** Forsythe also has incorporated into his opposition papers the declarations of several other disgruntled former Tristar employees. (Forsythe Mem. Ex D). Only one such employee, Ebony Stanford, makes any mention of Kim. Stanford alleges that Kim and other DCAS managers "always banned or had ... Bermudez recommend termination [or] transfer" of guards after DCAS officer Scott Aronson falsely complained about them. (*Id.* Ex. D–3). The Stanford declaration, however, does not contain so much as a syllable suggesting that any such termination or transfer was racially motivated.

all likelihood have to be denied for failure to state a claim.

## V. *Conclusion*

For the foregoing reasons, the City's motion for summary judgment, (Docket No. 37), is granted, and the Clerk of the Court is respectfully requested to close this case and any other motions that may be pending.

SO ORDERED.