Danny ALBUJA, et al., Plaintiffs,

v.

NATIONAL BROADCASTING COMPANY UNIVERSAL, INC., Defendant.

No. 10 Civ. 3126 (VM).

United States District Court, S.D. New York.

March 16, 2012.

602

Steven Anthony Morelli, Joshua Sam Beldner, The Law Office of Steven A. Morelli, P.C., Garden City, NY, for Plaintiffs.

Julie Rikelman, Mariano Schwed, NBC Universal Media LLC, New York, NY, for Defendant.

**DECISION AND ORDER**

VICTOR MARRERO, District Judge.

Plaintiffs Danny Albuja, Glen Boyd and Gentle Benjamin (collectively, "Plaintiffs") bring this employment discrimination suit against defendant National Broadcasting Company Universal, Inc. ("NBCU") under 42 U.S.C. § 2000e *et seq.*, ("Title VII"), 42 U.S.C. § 1981 (" § 1981"), New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.* ("NYSHRL"), and New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8–107 *et seq.* Plaintiffs allege that they experienced racial discrimination while employed by Defendant as "daily hires" in its New York Media Operations Center (the "NYMOC"). Specifically, Plaintiffs allege that they received disparate treatment relative to "Caucasian" co-workers with respect to scheduling, training opportunities, opportunities for permanent positions, and their ultimate termination when the NYMOC was closed. Now before the Court is NBCU's motion for summary judgment.

## I. BACKGROUND[1]

### A. PLAINTIFFS' EMPLOYMENT AT NBCU

Plaintiffs Albuja, who is Hispanic, and Boyd, an African–American man, each be-

1. The factual summary presented herein derives from the following documents: Complaint, *Albuja, et al. v. National Broadcasting Co. Universal, Inc.*, 10 Civ. 3126, filed Apr. 12, 2010; Defendant's Memorandum of Law in Support of its Motion for Summary Judgment, filed July 1, 2011 ("Def. Mem."); Defendant's Rule 56.1 Statement, filed July 1, 2011; the Declaration of Justin Beaudin in Support of Defendant's Motion for Summary Judgment, filed July 1, 2011; the Declaration of Sheryl Lashauer in Support of Defendant's Motion for Summary Judgment, filed July 1, 2011; the Declaration of Steven Lesniak in Support of Defendant's Motion for Summary Judgment, filed July 1, 2011; the Declaration of Mariano Schwed in Support of Defendant's Motion for Summary Judgment, filed July 1, 2011; Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment, filed Aug. 19, 2011 ("Pl. Mem."); the Declaration of Joshua Beldner in Opposition to Defendant's Motion for Summary Judgment, filed Aug. 19, 2011; the Declaration of Danny Albuja in Opposition to Defendant's Motion for Summary Judgment, filed Aug. 19, 2011; the Declaration of Glen Boyd in Opposition to Defendant's Motion for Summary Judgment, filed Aug. 19, 2011; the Declaration of Gentle Benjamin in Opposition to Defendant's Motion for Summary Judgment, filed Aug. 19, 2011; the Declaration of Jacqueline Flowers in Opposition to Defendant's

gan working for NBCU in December of 1995. Benjamin, who is also African–American, began his career at NBCU in December of 1998. Plaintiffs were "daily hires," a term defined in the applicable collective bargaining agreement as an at-will, shift employee. Daily hires are a separate class of employees from "permanent staff employees," and the terms of the two groups' employment are distinct. Under the express terms of the relevant collective bargaining agreement, daily hires have no entitlement to particular shifts or to receive severance payments upon termination and, should NBCU find it necessary to terminate daily hire positions, it has no obligation to lay off daily hires using any particular procedure. Daily hires are not guaranteed to be scheduled for any number of hours per week and are paid by the hour. Plaintiffs' pay-grade, as daily hires working in the NYMOC, was classified as "Group 5."

The primary function of the NYMOC was to "ingest" content for the NBCU television networks. Seven days a week and twenty-four hours a day, employees in the NYMOC fed videotapes into machines that converted those tapes into data files that were then broadcasted during NBCU television programming. Plaintiffs' duties included loading video of commercials and programs into such machines, playback ed-

iting, organizing layouts, and performing quality control tasks. These were the same basic duties as performed by permanent staff employees at the NYMOC.

In the spring of 2009, Plaintiffs were laid off when NBCU made the business decision to close the NYMOC and consolidate its operations with those of an existing facility in Englewood Cliffs, New Jersey (the "ECMOC"). Plaintiffs received no severance from NBCU and little notice of their termination and the NYMOC closure.

### B. *ALLEGED INSTANCES OF DISCRIMINATION*

#### 1. *Alleged Discrimination in Scheduling*

Plaintiff Boyd alleges that he was discriminated against during his employment at the NYMOC because he was consistently scheduled to work overnight shifts though Caucasian employees were scheduled during daytime shifts. The other daily hire typically assigned to overnight shifts was Marc Cheseborough, who is also African–American.

Dissatisfied with his schedule, Boyd requested morning or daytime shifts from NYMOC manager Jason Kornweiss ("Kornweiss") and scheduling coordinator Carole Franks ("Franks"). According to

Motion for Summary Judgment, filed Aug. 19, 2011; the Declaration of Stella Lafiette in Opposition to Defendant's Motion for Summary Judgment, filed Aug. 19, 2011; the Declaration of March Cheseborough in Opposition to Defendant's Motion for Summary Judgment, filed Aug. 19, 2011; the Declaration of Oswald Morales in Opposition to Defendant's Motion for Summary Judgment, filed Aug. 19, 2011; the Declaration of Steven Nieschawer in Opposition to Defendant's Motion for Summary Judgment, filed Aug. 19, 2011; the Declaration of Alan Palmer in Opposition to Defendant's Motion for Summary Judgment, filed Aug. 19, 2011; Plaintiffs' Counterstatement of Facts Pursuant to Rule

56.1, filed Aug. 19, 2011; Defendant's Reply Memorandum of Law in Further Support of Defendant's Motion for Summary Judgment, filed Sept. 16, 2011 ("Def. Rp. Mem."); the Declaration of Julie Radin in Further Support of Defendant's Motion for Summary Judgment, filed Sept. 16, 2011; the Declaration of Nicole Gonzalez in Further Support of Defendant's Motion for Summary Judgment, filed Sept. 16, 2011; and the Declaration of Mariano Schwed in Further Support of Defendant's Motion for Summary Judgment, filed Sept. 16, 2011. Except where specifically referenced, no further citation to these sources will be made.

Franks, Boyd was consistently assigned overnight shifts to accommodate his other request that he be scheduled to work forty hours each week.

Plaintiff Benjamin worked every weekend during his tenure at the NYMOC. On numerous occasions, Benjamin spoke with Franks and requested weekends off. Franks responded that the weekend shifts were the only shifts available.

Prior to 2006, Plaintiff Albuja typically worked forty hours each week at the NYMOC. At some point in or subsequent to 2006, Albuja's hours and responsibilities, such as training new NYMOC employees or working for specific content departments, were diminished. Though Albuja complained about his reduction in hours to NYMOC manager Justin Beaudin ("Beaudin"), who succeeded Kornweiss in that position in 2008, there is testimony that Caucasian daily hires were given the first opportunities when additional shifts became available. At the time Albuja was requesting additional hours, one daily hire, a Caucasian man named Howard Suss ("Suss"), was employed full time in the NBCU Editing Department and regularly scheduled to work in the NYMOC for overtime compensation.

Plaintiffs also point out that when an NYMOC supervisor, Suzanne Langwell ("Langwell"), took an extended vacation, a Caucasian daily hire, Dan Cox ("Cox"), was selected as a substitute. Cox had less experience at the NYMOC than Plaintiffs and Cox received an increase in pay, to "Group 7," during his service as a substitute supervisor.

### 2. Alleged Discrimination in Training Opportunities

Plaintiffs allege that they were denied opportunities to train in departments of NBCU's broadcast operation other than the NYMOC, although other daily hire employees, who were Caucasian and less experienced than Plaintiffs, were afforded such opportunities. In particular, Albuja requested training in a department referred to as "Skypath and Transmission." A position in the Skypath and Transmission department, after training, carried with it a paygrade of Group 7. Albuja's request was denied, but daily hire employee Suss was assigned to train in the Skypath and Transmission department, though he did not request such training. Suss was not, however, assigned to that department after his training because he informed managers that he would prefer to work in the NYMOC. More generally, Plaintiffs also requested training in various other departments at NBCU, including those dedicated to "Commercial Sign-In," "Master Control," and "Integrated Control." Though Caucasian daily hires were provided with opportunities to train in these departments, Plaintiffs were not.

### 3. Alleged Discrimination in Opportunities for Permanent Positions

Beginning in late 2005, Boyd began filling in for a permanent staff employee, Matthew Kolaso ("Kolaso"), who had taken a medical leave of absence. Though Boyd performed Kolaso's duties for almost a year, a Caucasian daily hire employee was elevated to the permanent staff to replace Kolaso when his medical problems ultimately forced him to retire.

In 2007, NBCU launched a program called "NBC2GO," which supplied content to a live video-over-cell-phone service called Media Flow. Opening NBC2GO created new job opportunities within NBCU. NBCU posted openings with NBC2GO on an internal website and accepted electronic applications through that website. Plaintiffs dispute NBCU's statement that applications for NBC2GO were required to be submitted electronically and NBCU has produced no documentary evidence of such

a policy or that such a requirement was communicated to Plaintiffs.

Albuja applied for a position with NBC2GO electronically; Benjamin provided a physical resume and called manager Kornweiss regarding positions with the new department.[2] Kornweiss selected neither Albuja nor Benjamin for a position with NBC2GO; the five employees Kornweiss did hire for NBC2GO included two minority applicants.

### 4. *Alleged Discrimination Related to the Closure of the NYMOC*

In late February 2009, NYMOC manager Beaudin informed Plaintiffs and the other daily hires that the NYMOC would soon be closing and consolidated with operations at the ECMOC.

Prior to the closing of the NYMOC, plaintiffs Albuja and Benjamin, along with their Caucasian NYMOC daily hire co-worker, Chris Carrano ("Carrano"), inquired about potential openings at the EC-MOC. At a meeting with a representative of the NBCU human resources department, Albuja, Benjamin and Carrano were told that there were no available positions at the ECMOC.

All of the daily hire employees in the NYMOC lost their jobs when the department closed. None received severance. Every daily hire at the NYMOC was terminated during 2009, though a Caucasian daily hire, Carrano, was retained longer than Plaintiffs, who were released during the spring of that year, while Carrano was retained into the fall. Only one NYMOC daily hire, Suss, continues to work for NBCU in any capacity, and only as a member of the Editing Department, where he had been employed prior to the closure of the NYMOC.

**2.** NBCU disputes this fact and maintains that Benjamin did not apply for a position with

## II. *LEGAL STANDARD*

The Court may grant a motion for summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(a). In making this assessment, the Court looks to the relevant substantive law to determine which facts are material: "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To survive summary judgment, the disputed factual issues must also be "genuine"—that is, "sufficient evidence [must] favor[ ] the nonmoving party for a jury to return a verdict for that party." *Id.* at 249, 106 S.Ct. 2505. The role of a court in ruling on such a motion "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. United States Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986).

The moving party bears the initial burden of demonstrating the absence of any genuine issues of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party satisfies its burden, the non-moving party must provide specific facts showing that there is a genuine issue for trial in order to survive the motion for summary judgment. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Shannon v. New York City Transit Auth.,* 332 F.3d 95, 98–99 (2d Cir. 2003).

NBC2GO in any form.

## III. DISCUSSION

Plaintiffs allege that NBCU discriminated against them in four areas: (1) scheduling and assignments, (2) training opportunities, (3) permanent job opportunities, and (4) their termination during the closure of the NYMOC. Each of these allegations will be discussed below; each is evaluated under the same legal standard.

Plaintiffs bring this action under Title VII, § 1981, the NYSHRL and the NY-CAC. Claims relying upon each of those authorities are evaluated under the same standard. *See Johnson v. CH Energy Group, Inc.*, 353 Fed.Appx. 543, 545–46 (2d Cir.2009) ("core substantive standards" of Title VII apply to § 1981 discrimination claims (internal quotation omitted)); *Batka v. Prime Charter, Ltd.*, 301 F.Supp.2d 308, 312 n. 4 (S.D.N.Y.2004) ("Claims of employment discrimination brought under the NYSHRL and the NYCHRL are analyzed under the same *McDonnell Douglas* framework as Title VII claims.") (*citing Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 n. 1 (2d Cir.2000)).

■ Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). The sufficiency of a Title VII discrimination claim is assessed under the three-step burden-shifting analysis outlined by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this framework, the plaintiff must first establish a prima facie case of discrimination. To do so, a plaintiff must demonstrate that: (1) he is a member of a protected class; (2) he is qualified for the position in question; (3) he suffered an adverse employment action;

and (4) the surrounding circumstances give rise to an inference of discrimination based on the plaintiff's membership in the protected class. *See Mario v. P & C Food Mkts., Inc.*, 313 F.3d 758, 767 (2d Cir. 2002); *Thomas v. Westchester Cnty. Health Care Corp.*, 232 F.Supp.2d 273, 278 (S.D.N.Y.2002). The plaintiff's burden in establishing a prima facie case is "de minimis," *Zimmermann v. Associates First Capital Corp.*, 251 F.3d 376, 380–81 (2d Cir.2001) (citations omitted); *see also McGuinness v. Lincoln Hall*, 263 F.3d 49, 53 (2d Cir.2001). NBCU does not contest that Plaintiffs are members of protected classes and qualified for the positions in question.

■ To satisfy the "adverse employment action" requirement, a plaintiff must present an employment action that effected the deprivation of "some 'tangible job benefits' such as 'compensation, terms, conditions or privileges' of employment." *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir.2002) (*quoting Karibian v. Columbia Univ.*, 14 F.3d 773, 778 (2d Cir.1994)). Adverse employment actions are material only if they are "of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse." *Torres v. Pisano*, 116 F.3d 625, 632 (2d Cir.1997).

If the plaintiff makes out a prima facie case, discrimination is presumed and the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the allegedly adverse employment action. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. If the defendant meets this burden, then the presumption of discrimination is rebutted and the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the defendant's proffered reasons

were merely pretext and that its conduct, under the circumstances, gives rise to an inference of unlawful discrimination. *See Burdine*, 450 U.S. at 253, 101 S.Ct. 1089; *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 168 (2d Cir.2001).

 A plaintiff opposing summary judgment must present sufficient evidence of discriminatory intent underlying the defendant's action. It is not necessary for the plaintiff to show that defendant's asserted non-discriminatory reasons played no role, but rather that discriminatory reasons were "at least one of the motivating factors." *Vergara v. Yonkers Pub. Schs.*, 386 F.Supp.2d 377, 385 (S.D.N.Y.2005) (internal quotations omitted). While courts are hesitant to resolve discrimination claims on summary judgment because the employer's intent is often disputed, summary judgment is appropriate where the non-moving party's evidence is "so scant that a rational jury could not find in its favor." *Chertkova v. Connecticut Gen. Life Ins. Co.*, 92 F.3d 81, 87 (2d Cir.1996) (citation omitted).

## A. *ALLEGED DISCRIMINATION IN SCHEDULING AND ASSIGNMENTS*

As a threshold issue, NBCU argues that decisions regarding scheduling cannot, as a matter of law, be considered adverse employment actions. In support of this argument, NBCU cites several district court cases in this circuit holding that "courts have consistently rejected claims of discrimination arising from assignment of unwanted work schedules." *Constance v. Pepsi Bottling Co. of N.Y.*, No. 03 Civ. 5009, 2007 WL 2460688, at *18 (E.D.N.Y. Aug. 24, 2007); *see also* Def. Rp. Mem. at 4.

"The Second Circuit, however, has not ruled out the possibility that a shift change could rise to the level of an adverse employment action." *Forsythe v. New York City Dept. of Citywide Admin. Servs.*, 733 F.Supp.2d 392, 400 (S.D.N.Y.2010); *see also Little v. National Broadcasting Co.*, 210 F.Supp.2d 330, 377 (S.D.N.Y.2002) (noting that "a shift assignment that makes a normal life difficult for the employee" may constitute adverse employment action).

Plaintiffs invoke *Gibson v. American Broadcasting Cos., Inc.*, 892 F.2d 1128, 1134 (2d Cir.1989), in support of their position that the Second Circuit has recognized that unfavorable scheduling can constitute an adverse employment action. However, *Gibson*, decided in 1989, did not examine the question of whether or not scheduling decisions could constitute an adverse employment action. *See Guglietta v. Meredith Corp.*, 301 F.Supp.2d 209, 215 n. 1 (D.Conn.2004) ("It is beyond cavil that *Gibson* never mentions the phrase 'adverse employment action,' nor does its analysis have any resemblance to such a claim."). The district court in *Gibson* assumed that the plaintiffs had made their prima facie case of discrimination and, on appeal, the Second Circuit merely noted that the plaintiffs' allegations regarding their qualifications were accepted as true for purposes of establishing their prima facie case. *Gibson*, 892 F.2d at 1131. In short, *Gibson* does not address one of the questions presented by Plaintiffs' claims here: Do scheduling decisions, which have no alleged impact on a plaintiff's compensation, constitute an adverse employment action under Title VII?

 Nor does *Little* answer this question in the affirmative. The holding in *Little* is limited to circumstances in which a plaintiff has "produced evidence that he incurred an actual loss in income because of" the undesirable schedule.[3] *Little*, 210

---

3. Similarly, in *Forsythe,* the Court denied a defendant's motion for summary judgment

where the plaintiff alleged "that his shift change severely disrupted his child care rou-

F.Supp.2d at 379. Indeed, viewing *Little* alongside the cases cited by NBCU, a clear distinction among scheduling cases becomes evident: Where the change in schedule does not occasion a reduction in wages or job responsibilities, unfavorable schedules are a "mere inconvenience" and not an adverse employment action. *See, e.g., Johnson v. Eastchester Union Free Sch. Dist.*, 211 F.Supp.2d 514, 518 (S.D.N.Y.2002) ("Apart from asserting the inconvenience of the change in location and hours, plaintiff has failed to adduce any evidence that those changes constituted a demotion ... [such as] a reduction in wages or that his job responsibilities were altered ...."); *Ruhling v. Tribune Co.*, No. CV 04–2430, 2007 WL 28283, at *10 (E.D.N.Y. Jan. 3, 2007) ("[A] schedule change *standing alone* does not constitute an adverse employment action." (emphasis added)); *Guglietta*, 301 F.Supp.2d at 215 ("Plaintiff did not suffer an adverse employment action when. Defendant required that she transfer to another shift, which transfer would have caused no diminution in salary or benefits; the job responsibilities would have remained the same; [and] the proposed transfer was in no way a demotion ....").

Plaintiffs allege that particular scheduling and assignment decisions amount to adverse employment actions as to each of them individually. With the preceding legal discussion in mind, each plaintiff's allegations, then, must be addressed in turn.

### 1. *Albuja*

■ Albuja asserts that his hours were reduced after certain Caucasian employees joined the NYMOC. As a part of this reduction in hours, these new employees allegedly began performing Albuja's duties with respect to certain tasks in the NY-MOC. Because Albuja worked fewer hours and daily hire workers were paid hourly, his wages declined correspondingly. Albuja has made a prima facie case of racial discrimination by alleging that his hours were reduced for the benefit of Caucasian coworkers and that this assignment decision resulted in a reduction in his compensation.

NBCU disputes that Albuja's hours were reduced in favor of Caucasian employees, pointing to the undisputed fact that Albuja worked more total hours than these Caucasian employees during the final two years of operation for the NY-MOC. Albuja counters by framing an alternative period of time in which he did not receive his requested forty hour per-week schedule while Caucasian employees worked forty hours a week and received overtime assignments. NBCU has not provided a non-discriminatory explanation for Albuja's reduction in hours, merely stating that daily hires were not guaranteed any allocation of hours.

The parties, then, dispute whether or not Albuja's hours were redistributed to Caucasian employees at the NYMOC during the last years of the department's operation. This dispute is clearly material because if a finder of fact determines that Albuja's hours were intentionally reduced for the benefit of his Caucasian peers, Albuja could establish that he suffered an adverse employment action as a result of racial discrimination. Accordingly, as to Albuja's claim regarding scheduling, NBCU's motion for summary judgment must be. denied.

### 2. *Boyd*

■ From 2006 to 2009, Plaintiff Boyd was scheduled to work overnight shifts at

---

tine and ability to spend time with his son." 733 F.Supp.2d at 401. Because negative effects on child care may render an employment action adverse, the Court found a disputed issue of fact. *Id.*

the NYMOC despite his expressed desire to work during the daytime. Boyd's regular coworker during these overnight shifts was also an African–American man; Marc Cheseborough. Lesser-experienced Caucasian employees of the NYMOC were scheduled for preferable daytime shifts. Boyd submits that, because "[a] showing that the employer treated a similarly situated employee differently is a common and especially effective method of establishing a prima facie case of discrimination," he has satisfied his initial burden at the first step of the *McDonnell Douglas* inquiry. *McGuinness v. Lincoln Hall,* 263 F.3d 49, 53 (2d Cir.2001) (internal quotation omitted).

Boyd, however, has not asserted that working night shifts caused any diminution in his compensation or job responsibilities. NBCU asserts that Boyd's nighttime schedule was the product of its attempt to accommodate his request to be scheduled for forty hours per week. Boyd's "unfavorable" schedule, thus, seems to have *increased* his compensation. Because Boyd fails to assert any deleterious effects attending his inconvenient schedule, he has failed to establish that his work schedule constituted an adverse employment action. As such, Boyd has failed to carry his initial burden to present a prima facie case of discrimination as to scheduling.

Even if Boyd's allegations regarding his nighttime schedule did rise to the level of an adverse employment action and he was able to establish a prima facie case of discrimination, NBCU has proffered a legitimate reason for this schedule. Specifically, NBCU proffers that Boyd's nighttime schedule resulted from NBCU's attempt to accommodate his competing request to be scheduled for forty hours per week. Boyd has pointed to no evidence that suggests that this reason is pretext.

### 3. *Benjamin*

Benjamin was consistently assigned to work weekend shifts and his recurrent requests to have weekends off were not accommodated. Benjamin asserts that this scheduling decision was the result of racial discrimination.

 Benjamin, like Boyd, cannot carry his burden to establish a prima facie case of discrimination because the undisputed facts show his weekend schedule was a "mere inconvenience" and did not amount to an adverse employment action. "To be 'materially adverse, a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities.'" *Das v. Consolidated School Dist. of New Britain,* 369 Fed.Appx. 186, 189 (2d Cir.2010) (*quoting Galabya v. New York City Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir.2000)). As Benjamin himself put it: "I didn't mind the evenings, but I would have liked to have at least, you know, one or two weekends off a month or so." (Declaration of Mariano Schwed in Further Support of Defendant's Motion for Summary Judgement, filed on Sept. 16, 2011 (Docket No. 46), Ex. 17 at 52.) Because Benjamin's own testimony characterizes his schedule as inconvenient rather than materially adverse, he cannot make a prima facie case of discrimination.

### 4. *Selection for a 2008 Substitute Supervisor Shift*

 NBCU has set forth neither facts nor legal argument in response to Plaintiffs' allegations regarding the 2008 temporary supervisor position open during Langwell's vacation. The temporary position carried with it an increase in pay, and, therefore, if Plaintiffs were denied it on account of their race, this could constitute an adverse employment action and provide the bases for a prima facie case of racial discrimination.

In its briefing, NBCU has set forth no legitimate, nondiscriminatory reason for its decision that Cox, a Caucasian NYMOC daily hire, should perform this temporary supervisor role rather than Plaintiffs. There is evidence on record suggesting such a reason, however. Beaudin, the NYMOC manager at the time, testified that Cox was selected to fill in for Langwell because of his communication skills and ability to work with related NBCU departments.

Plaintiffs contend that Beaudin's explanation is pretextual because it is undisputed that Cox had worked at NBCU for less than three years and only began working at the NYMOC earlier in 2008. These facts could be interpreted as supporting Beaudin's reasoning: Cox's experience in other departments may have rendered him more able than Plaintiffs to work cooperatively with those other departments. These facts, however, can also be read to support Plaintiffs' position that Cox's relative inexperience undermines the legitimate reason NBCU would presumably proffer in defense of this staffing decision. Because NBCU has not even attempted to carry its burden of demonstrating the absence of any disputed issue of material fact as to the 2008 temporary supervisor shift and because the facts before the Court could support the conclusion that NBCU's potential nondiscriminatory reason was pretextual, summary judgment on this issue is inappropriate.

## B. ALLEGED DISCRIMINATION IN TRAINING OPPORTUNITIES

"To successfully establish denial of training opportunities as an adverse employment action, a plaintiff must demonstrate that the employer offered training to other employees and that [the plaintiff] was denied training under circumstances giving rise to an inference of discrimination." *Nidzon v. Konica Minolta Bus. Solutions, USA, Inc.*, 752 F.Supp.2d 336,

349 (S.D.N.Y.2010) (*citing Ani v. IMI Sys., Inc.*, No. 98 Civ. 8430, 2002 WL 1888873, at *5 (S.D.N.Y. Aug. 15, 2002)). As outlined above, Plaintiffs assert that they were denied opportunities to train for various departments outside of the NYMOC and that the denial of such opportunities was based on their race.

As an initial matter, it is undisputed that neither Benjamin nor Boyd ever requested or formally applied for training outside of the NYMOC. Accordingly, the undisputed facts regarding these two plaintiffs cannot support a claim of racial discrimination in training.

Albuja did, however, request to be trained in several other NBCU departments, including Skypath and Transmission, Commercial Sign In, Integrated Control, and Master Control. The undisputed facts show that Caucasian NYMOC employees were afforded opportunities to train in those departments. Albuja, then, can make a prima facie case of discrimination as to training. *See McGuinness*, 263 F.3d at 53.

NBCU has proffered a legitimate, nondiscriminatory reason for its decision not to offer training to Albuja. NBCU asserts that Albuja was not offered training because he was not a top performer and that NBCU management, specifically Kornweiss, did not believe he would succeed if given increased responsibilities. To support its position, NBCU points to the testimony of each of Albuja's managers at the NYMOC, which noted concerns about his work ethic and performance, including incidents in which Albuja was found asleep at his desk or reprimanded for tardiness or recalcitrance.

"Defendants' burden at this stage is not to prove nondiscrimination. Instead, defendants must 'introduce evidence which, *taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action.'" *Mattera v.*

*JPMorgan Chase Corp.*, 740 F.Supp.2d 561, 574 (S.D.N.Y.2010) (*quoting St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)). Here, NBCU points to specific evidence supporting its contention that Albuja's performance was not sufficient to justify his receiving additional training.

During his deposition, Albuja admitted that each and every one of his managers at the NYMOC had repeatedly reprimanded him for job performance issues. And the deposition testimony of various NYMOC supervisors, including Kornweiss, confirms this. Though NBCU has produced no contemporary documents demonstrating that Kornweiss himself shared these work performance reservations,[4] there is no evidence on record that refutes or contradicts that which Albuja himself has conceded: NYMOC managers frequently expressed concerns with his job performance. Emails written by NYMOC managers who preceded and succeeded Kornweiss describe "incidents" involving Albuja, such as sleeping at his desk and providing inconsistent information to supervisors, and characterize his job performance as "general[ly] sub par." (*See* Declaration of Mariano Schwed in Support of Defendant's Motion for Summary Judgment ("Schwed Decl."), filed July 1, 2011 (Docket No. 25), Exs. 8–10.) Moreover, the lack of documentation reflecting instances in which Albuja's performance was found to be unsatisfactory is unsurprising because NBCU did not perform routine performance reviews of daily hire employees at the NYMOC. The undisputed facts demonstrate that NYMOC managers believed that Albuja was not a top performer among NYMOC daily hire employees.[5]

Albuja is unable to refute NBCU's proffered nondiscriminatory reason for refusing to provide him with Skypath training because there is no evidence suggesting that NBCU's reason is pretextual.[6] There is undisputed evidence, which fatally un-

---

4. Kornweiss testified at length during his deposition regarding his concerns with Albuja's performance.

5. Albuja attempts to discredit NBCU's criticism of his job performance by scrutinizing remarks regarding Albuja's relatively low "dub numbers." The phrase "dub numbers" refers to the rate at which an NYMOC employee converted tape recordings to computer files. While Albuja does point out several reasons why his "dub numbers" may not be the most indicative measure of his job performance, NBCU's citation of that statistic does not render pretextual its legitimate reason to refuse Albuja's requests for training because it was among various other particularized shortcomings found in Albuja's performance.

6. Plaintiffs offer affidavits from several non-party NYMOC co-workers that include statements to the effect that minority NYMOC daily hires were more frequently and more severely reprimanded than their Caucasian counterparts. Though Plaintiffs argue that this testimony should be viewed to suggest that NBCU's proffered reason for denying Albuja training opportunities is pretextual, these statements do not directly support the proposition that Albuja's race played any role in NBCU's decisions not to offer him requested training. The frequency and intensity of reprimands received by minority daily hires does not establish anything with respect to their underlying job performance. Such a pattern of reprimands could be the result of racial animus, or it could be the result of a corresponding pattern of poor performance by the particular employees that the affiants happened to observe being reprimanded. The statements in these affidavits are conclusory and provide no concrete examples or detail from which a finder of fact could conclude that the alleged pattern in NYMOC reprimands was connected to racial discrimination in training decisions.

NBCU's proffered reason for denying Albuja requested training was not that he was frequently reprimanded, but rather that his job performance was not sufficiently exemplary so as to merit additional training opportunities. To NBCU, then, the reprimands were unrelated to the decision to refuse him training, though both the reprimands and that

dermines Albuja's assertion of pretext, that NBCU selected Joe Rivette, a Hispanic NYMOC daily hire, to receive the Skypath and CSI training that Albuja was denied.

■ Additionally, Albuja asserts that his performance could not be the actual justification for NBCU's failure to train him in Skypath because, during his deposition, Kornweiss rejected a characterization that a Caucasian Skypath trainee—Suss—was more skilled than Albuja. Albuja, however, ignores all context surrounding this statement. Kornweiss's denial that Suss was more skilled than Albuja occurred immediately after Kornweiss testified extensively regarding Suss's "exceptional" work performance, "exceed[ing]" "typical training cycle[s]," and describing Suss as a "self-starter" who "was always looking to find more things to keep the operation moving forward, even if it wasn't right there in front of him." (Declaration of Joshua Beldner ("Beldner Decl."), filed Aug. 19, 2011 (Docket No. 30), Ex. E at 6B.) To sustain a claim of discrimination based on an employer's selection of an inferior candidate for a position, a "plaintiff's credentials would have to be so superior to the credentials of the person selected for the job that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff." *Byrnie v. Town of Cromwell Bd. of Educ.*, 243 F.3d 93, 103 (2d Cir.2001) (quotation omitted). Albuja cannot make such a showing as to Suss.

Albuja has failed to put forth evidence suggesting that the espoused concerns regarding his performance were pretext for the racially-motivated denial of training opportunities. As such, Albuja's claim of discrimination in the provision of training opportunities cannot survive summary judgment.

## C. *ALLEGED DISCRIMINATION IN PERMANENT JOB OPPORTUNITIES*

Plaintiffs allege that they were discriminated against because they were not selected for two permanent job openings with NBCU.

■ First, Boyd asserts that he was discriminated against when a Caucasian daily hire employee was selected to replace a retiring permanent staff employee. It is undisputed that this position was not advertised or posted and that Boyd did not apply for this position. Because he did not apply for the position, Boyd cannot sustain a claim that he was denied the position by virtue of his race. The Court of Appeals for the Second Circuit has ruled that to state a prima facie case for failure to promote, the employee is required to "allege that she or he applied for a specific position or positions and was rejected therefrom, rather than merely asserting that on several occasions she or he generally requested promotion." *Brown v. Coach Stores, Inc.*, 163 F.3d 706, 710 (2d Cir. 1998). Because Boyd was aware of this opening—he was, after all, filling the position on an explicitly interim basis—and does not allege that he even discussed with his manager how the position would be filled until after a replacement was selected, Boyd cannot argue an exception to the specific application requirement.[7] *See Pe-*

---

decision certainly may have each derived from Albuja's managers' low estimation of his job performance. In the words of the United States Supreme Court, "statements by decisionmakers unrelated to the decisional process itself" "cannot justify requiring the employer to prove that its hiring or promotion decisions were based on legitimate criteria."

*Price Waterhouse v. Hopkins*, 490 U.S. 228, 277, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) *superseded by statute on other grounds.*

7. Moreover, at his deposition, Boyd testified that the Caucasian employee hired to fill this position was the nephew of the retiring employee. "As much as nepotism may smack of

trosino v. Bell Atlantic, 385 F.3d 210, 227 (2d Cir.2004) ("[T]o be excused from the specific application requirement, an employee must demonstrate that (1) the vacancy at issue was not posted, *and* (2) the employee either had (a) no knowledge of the vacancy before it was filled or (b) attempted to apply for it through informal procedures endorsed by the employer." (emphasis added)).

Second, Albuja and Benjamin allege that they were discriminated against in 2007 when NBCU did not hire them to fill permanent positions available with its new NBC2GO enterprise.

■ Benjamin's claim must fail because he did not follow NBCU's online process for internal job applicants. Though Plaintiffs point to the lack of documentary evidence that this policy was in force, the testimony of the NBCU managers and Albuja himself demonstrate that NBCU did solicit applications through its internal website, and even required an online application when the applicant already worked for the hiring manager and had submitted a physical resume to them. Documents supplied by NBCU include printouts from this internal online application system, described as "a list of all job applicants." Benjamin is not among them; Albuja is. (*See* Schwed Decl., at 3; *id.,* Ex. 13.) Even if Benjamin attempted to submit a physical resume to Kornweiss—which NBCU disputes—Benjamin's claim for discriminatory treatment surrounding NBC2GO hiring still must fail because his situation does not fall within the "narrow" exception to the specific application requirement; he did not "attempt[ ] to apply for" the NBC2GO opening "through infor-

mal procedures *endorsed* by the employer." *Petrosino,* 385 F.3d at 227 (emphasis added).

■ Albuja's claim must fail for the same reason as his failure to train claim above. Even assuming that Albuja has made a prima facie case of discrimination, NBCU has presented a legitimate nondiscriminatory reason for its decision not to place him in a permanent position, specifically that his job performance was not of a caliber that NBCU managers believed merited such a promotion.

Albuja argues that NBCU's proffered motive is pretextual by casting doubt upon certain facts presented by NBCU. Kornweiss, who was responsible for the early NBC2GO hiring, cited Albuja's relative lack of experience with master control work as supporting his decision to hire other engineers for NBC2GO. Albuja contends that, during an earlier three year period, he worked in an NBCU department called the "HUB," during which time he performed master control duties. Albuja, however, does not dispute that the employees Kornweiss ultimately hired for NBC2GO had substantial master control experience, and, as discussed above, courts will not upset a business's personnel decision among similarly-qualified candidates. *See Byrnie,* 243 F.3d at 103; *see also Stern v. Trustees of Columbia Univ.,* 131 F.3d 305, 313 (2d Cir.1997) ("[W]e do not second-guess an employer's hiring standards. . . ."). Accordingly, that Albuja had master control experience does not demonstrate pretext. Albuja has not presented any other evidence suggesting that NBCU's rejection of his NBC2GO application was based on anything other than

unfairness, it is not discrimination and it is not illegal." *Martin v. Queens Cty. Civil Ct.,* No. 07–CV–1485, 2009 WL 3497489, at *16

(E.D.N.Y, Oct. 28, 2009) (*citing Fisher v. Vassar College,* 114 F.3d 1332, 1337 (2d Cir. 1997)).

Kornweiss's assessment of his performance relative to other applicants. As such, Albuja has failed to carry his burden.

For these reasons, summary judgment dismissing Plaintiffs' failure to promote claims is appropriate.

## D. *ALLEGED DISCRIMINATION IN TERMINATION*

■ Plaintiffs' claims of discrimination related to their termination and the closure of the NYMOC also fail to survive summary judgment.

Initially, Plaintiffs cannot state a prima facie case of discrimination. Plaintiffs admit that every daily hire NYMOC position was terminated and that none of the full-time daily-hire NYMOC employees—Caucasian, African American or Hispanic—were retained by NBCU.

Plaintiffs assert that the alleged history of discrimination with respect to scheduling, training and permanent position opportunities, described above, creates an inference that their termination, upon the NYMOC closure, was racially motivated. In further support of their position, Plaintiffs point to a document entitled "NY MOC Transition Planning," in which the "likelihood of reduction" for each Plaintiff is listed as certain while the likelihood of reduction for several Caucasian daily hire employees is indicated to be "N/A." (*See* Beldner Decl., Ex. U.) The authorship and origin of this document is unclear, however, it was apparently created many months before the actual closure of the NYMOC and the personnel recommendations it contained were not ultimately adhered to by NBCU. One of the Caucasian daily hire employees listed with a "likelihood of reduction" as "N/A", Carrano, was ultimately terminated after the closure of the NY-

MOC. Another Caucasian daily hire, Cox, was also terminated upon the closure of the NYMOC, though he is not listed on the "NY MOC Transition Planning" document at all. This document could be read to suggest that NBCU may have made racial delineations at some unspecified point during its decisionmaking process regarding terminations upon the NYMOC closure. There is no dispute, however, that the document was not ultimately adhered to by NBCU in closing the NYMOC. Thus, though the document might be construed to suggest discriminatory classification of employees, such an inference cannot survive in light of the fact that the underlying adverse employment action at issue—termination—ultimately befell minority and non-minority daily hires alike. As such, Plaintiffs cannot make a prima facie case.

Moreover, Plaintiffs do not dispute that NBCU had legitimate business reasons to close the NYMOC, which NBCU has proffered as a nondiscriminatory reason for Plaintiffs' terminations. Rather, Plaintiffs allege that this legitimate reason is advanced as pretext for NBCU's discriminatory termination of Plaintiffs. Plaintiffs assert that NBCU acted in a manner inconsistent with its legitimate purported reason by discouraging them from applying for other positions within the company, and that such inconsistency with their proffered legitimate reason reveals that racial animus also played a role in NBCU's determination to lay Plaintiffs off. However, it is undisputed that, at the meeting in which plaintiffs Albuja and Benjamin were told that there were no openings, a Caucasian daily hire was present and received the same discouragement. Because daily hire NYMOC employees of all racial backgrounds were terminated upon the closure of the NYMOC and daily hire NYMOC employees of all racial backgrounds

were instructed that there existed no job openings available to them within NBCU, Plaintiffs cannot present evidence demonstrating pretext in NBCU's proffered nondiscriminatory reason for terminating them.

## IV. *ORDER*

For the reasons set forth above, it is hereby

**ORDERED** that the motion (Docket No. 19) of defendant National Broadcasting Company Universal, Inc. ("NBCU") for summary judgment dismissing the complaint of plaintiffs Danny Albuja ("Albuja"), Glen Boyd and Gentle Benjamin (collectively, "Plaintiffs") pursuant to Federal Rule of Civil Procedure 56 is GRANTED in part and DENIED in part in accordance with this Decision and Order; and it is further

**ORDERED** that the parties appear at a conference with the Court on April 13, 2012 at 10:30 a.m. to discuss trial preparations and scheduling, as well as the prospects for settlement of this action.

**SO ORDERED.**