John GRENAWALT; Carlos Miranda and Julio Alicea, on behalf of themselves and all other similarly situated, Plaintiffs,

v.

AT & T MOBILITY, LLC, Alpha Omega Protection Services Corp., Grace Depompo, Gladius, Inc. and Centuria Inc., Defendants.

No. 11 Civ. 2664(ALC).

United States District Court, S.D. New York.

April 2, 2013.

Jason Jerome Rozger, Beranbaum Menken Ben–Asher & Bierman LLP, New York, NY, for Plaintiffs.

Nicholas M. Moccia, Law Offices of Robert E. Brown, P.C., Staten Island, NY, Robert Edward Brown, Robert E. Brown, P.C., Mark B. Stumer, Sr., Mark B. Stumer & Associates, P.C., New York, NY, for Defendants.

## AMENDED OPINION AND ORDER

ANDREW L. CARTER, JR., District Judge.

This case presents a tangled web of claims and cross-claims. Plaintiffs John Grenawalt, Carlos Miranda and Julio Alicea (collectively, "Plaintiffs"), former security guards, bring claims under different theories against a motley crew of defendants: Alpha–Omega Protection Services Corporation ("A–O"), and its principal, Grace DePompo ("DePompo" and, together with A–O, the "A–O Defendants"), who directly employed Plaintiffs as temporary security guards; AT & T Mobility ("AT & T"), the alleged joint employer, in whose New York and New Jersey stores Plaintiffs acted as security guards; Gladius, Inc. ("Gladius"), a now-defunct provider of security services that contracted with AT & T to provide security services in AT & T stores and with A–O Defendants to actually coordinate and make security guards

available to fulfill Gladius's contract with AT & T; and Centuria, Inc. ("Centuria"), Gladius's alleged successor-in-interest.

## BACKGROUND

### I. Procedural History

Plaintiffs filed their suit on April 19, 2011 against A–O Defendants, AT & T, Gladius and Centuria. Citing inability to pay, A–O dismissed its counsel on March 8, 2012 and has been without counsel ever since (Dkt. No. 138). On March 8, 2012, Magistrate Judge Peck entered default judgment against A–O in favor of Plaintiffs for $818,000 because a corporation may not appear *pro se* in federal court. (Dkt. No. 139).

Plaintiffs allege that they are owed regular and overtime wages for their services as security guards in AT & T stores in the New York metro area. Against Gladius, Plaintiffs seek summary judgment and class certification of their claim that they are third-party beneficiaries of the agreement between A–O and Gladius. Plaintiffs seek class certification and summary judgment on their Fair Labor Standards Act (FLSA) and New York Labor Law (N.Y.LL) claims against AT & T.

Defendant Gladius brings cross-claims against Alpha Omega for breach of contract, unjust enrichment, fraud and business disparagement and brings a motion to compel arbitration against Plaintiffs. In the alternative, it seeks summary judgment against Plaintiffs on the ground that Plaintiffs are not third-party beneficiaries, and against A–O because it is not represented by counsel. Gladius also seeks to dismiss Plaintiffs' motion for class certifi-

cation of the third-party beneficiary claims.

Defendant Centuria seeks dismissal in favor of arbitration on Plaintiffs' successor-in-interest claim. In the alternative, it seeks summary judgment against Plaintiffs on the ground that there is no successor-in-interest liability in this case, and against A–O because it is not represented by counsel, Centuria also seeks to dismiss Plaintiffs' motion for class certification of the successor-in-interest claims.

Defendant AT & T seeks summary judgment on Plaintiffs' claims for unpaid wages and unpaid overtime wages, or in the alternative, dismissal of Plaintiffs' state law class action claims on jurisdictional grounds and denial of denying Plaintiffs' motion for class certification on the FLSA and NYLL claims.

### II. Facts [1]

#### Gladius Meets AT & T [2]

Defendant Gladius is a security company that provides, inter alia, security guard protection for retail businesses. Though Gladius is based in Texas, it has customers nationwide and sometimes outsources to staff the security guard needs of its customers outside of Texas.

Defendant AT & T owns and operates approximately 142 retail stores throughout its "New York Market," which includes lower New York State, the five boroughs of New York City and Long Island. (PX52 at 9:14–10:4). The retail stores sell AT & T's wireless communication, internet and television services, related equipment and accessories such as mobile phone, tab-

---

**1.** The stated facts rely heavily on Plaintiffs' and Defendants' Rule 56.1 Statement of Material Facts (Dkt. Nos. 154, 168(II), respectively) and Counterstatements (Dkt. Nos. 161, 168(I), respectively). "PX___" refers to ex-

hibits attached to the Affidavit of Jason Rozger (Dkt. No. 152).

**2.** Gladius first contracted with AT & T's immediate predecessor, Cingular.

lets, modems, and phone cases. (*Id.* at 13:7–14:13). Each store is individually managed by a store manager, who oversees the work of a group of AT & T employees assigned to the store, including an assistant manager and sales and customer service associates who are primarily responsible for helping customers and selling AT & T services and the store's merchandise. *Id.*

Certain of AT & T's stores in the New York Market requested or had been given an on-site security presence to deter theft and other unwanted behavior during the holiday season, during special events, or in other instances. (*Id.* at 15:4–13, 24:23–25:5). However, not every AT & T store in the New York Market has armed security guards or any security guards. (*See* Defs. Rule 56.1 Stmt. ¶ 217). The length of time of a given security detail depends on store need, and can vary between periods as short as a day, as long as a month or on a more regular basis. (PX52 at 31:11–17, 46:13–22).

After receiving requests for security from the New York Market, AT & T met with several different vendors, including Gladius, which had been providing security services to AT & T in other geographic areas. (*Id.* at 21:20–21:5). In or about 2006, AT & T entered into an agreement with Gladius to provide security to certain of AT & T stores in the New York market. (*Id.* at 22:25–23:18).

*Gladius Meets DePompo*

In or about October 2006, DePompo met the principals of Gladius, Joe Branch and Herbert Isham, at a Private Investigator state test in New York. In or about December 2006, DePompo was contacted about the possibility of her helping Gladius Protection, Inc. ("GPI") fulfill an agreement with Cingular (now AT & T) to post security guards in some of their New York and New Jersey stores during the holiday season. GPI subcontracted with BCC Investigations ("BCC"), an operation run by Branch's uncle, and used BCC's license to provide security services. As a recently retired police officer, DePompo reached out to officer networks to find officers willing to work security in their off-hours.

In January 2007, GPI asked DePompo to reprise coordination of officers for security services for a more regular contract GPI had achieved with Cingular, AT & T's predecessor. DePompo's coordinating duties included assigning officers to their posts, attendance, availability, making sure the guards had the manager's information. (PX 47 at 20:15–21). Although DePompo coordinated the guards, she did so for BCC who then was directly accountable to GPI. In or about April 2007, DePompo incorporated A–O, but still continued to coordinate guards through BCC. During this time, the guards received their wages from BCC, funded ostensibly by GPI. DePompo was paid as an independent contractor for BCC. The A–O Defendants regularly contracted with no less than eighty guards to provide security services to approximately twenty-three AT & T stores in New York and New Jersey. (PX47 at 49:9–50:2, 72:16–73:5).

*The Independent Contractor Agreement (ICA)*

On June 24, 2008, Gladius and A–O entered the Independent Contractor Agreement ("ICA"). The ICA makes no mention of the fact that Gladius paid A–O a coordination fee of $5 for each hour of security services billed to Gladius. (*See* PX48 at 38:16–38:22; PX46 at 44:4–10). Nor does it mention that DePompo or A–O would be providing armed guards to the AT & T stores. (PX39; PX46 at 64:14–65:3). To DePompo's understanding, the ICA was a continuation of the previous relationship. (PX48 at 57:3–58:11; PX47 at 172:7–25).

It is unclear what the established pay rate was for the guards. The ICA incorporates by reference a Compensation Agreement that establishes the rates were $25 for New York officers and $30 for New Jersey officers, but it is disputed whether the "25 New York/30 New Jersey" language refers to the money to be paid to the guards, or the total amount A–O was to be reimbursed for the guards' services. (*See* PX39).

Additionally, the ICA contains an arbitration clause that "any controversy or claim arising out of or relating to this Agreement, or breach of it, is to be settled by arbitration ..." (PX39, at § 7). The ICA contains nothing on its face suggesting the A–O Defendants or Gladius intended to confer benefits on any third-party, (*see generally id.*), and states in Article 1.1 that the ICA shall not "be construed as creating any relationship between Gladius and Independent Contractor's employees [the Plaintiffs]," (*Id.* at § 1.1).

*Scope of Guard Services at AT & T*

Generally, AT & T did not request specific guards or know which guards would be assigned to specific stores. Instead, AT & T identified for Gladius the locations, days and hours for which it needed service. (PX52 at 30:15–23, 46:23–47:16, 49:19–51:6; Mancebo Decl. at ¶¶ 10, 24.) Occasionally, however, some AT & T store managers requested specific guards. (PX47 at 197:11–198:2, 198:13–199:17; PX62 at 28:5–14; PX63 at 25:3–11). In turn, Gladius would advise A–O which AT & T stores needed coverage and for what hours, and A–O would work with guards to ensure coverage was provided. (PX48 at 37:19–38:12, 26:10–27:17). Likewise, if an AT & T store manager had an issue with guard performance, he or she would tell the AT & T property manager, who would then contact A–O or Gladius. (PX52 at 70:15–71:7). AT & T would report grievances such as viewing pornography in the store on AT & T computers, sitting down or sleeping on the job, failing to guard against theft, and repeatedly arriving late in this manner. (*See* Defs. Counterstatement ¶ 32). DePompo recalls only one occasion where a store manager contacted her directly about a guard; when Plaintiff Grenawalt was drinking alcohol during his lunch breaks and then returning to work. (PX47 at 97:23–10:18).

DePompo admittedly exercised discretion to set the rates for the guards and did so by considering the location, lead time and other individual circumstances. (PX47 at 29:15–30:17). Guards generally did not report to AT & T for scheduling unless it was to report that they were sick or running late (PX57 at 46:5–21) or for other officers (*see id.* at 42:5–18). Occasionally, an AT & T store manager, who was familiar with Plaintiff Alicea, called him if a different guard did not report to the store for a post and the manager was unable to reach anyone at A–O, and Alicea would relay the message to A–O. (*Id.* at 41:10–43:8; *see also* PX54 at 38:11–39:4 (same for Miranda)).

A–O, through DePompo recruited and hired the security guards, collected personal information about the each guard during the hiring process and required each guard to maintain the appropriate licenses. (*See* Defs. Counterstatement ¶ 32). DePompo distributed written post orders from 2007, on AT & T's letterhead (PX25) to the guards. (Pltfs. Rule 56.1 Stmt ¶ 47). Subsequent written post orders effective the summer of 2010, on A–O letterhead, (PX26) were consistent with the earlier ones in that they instructed the guards to coordinate breaks with the store manager or assistant, to meet with the store manager to discuss security measures and the day's events, and to exchange phone numbers with the manager. (Pltfs.

Rule 56.1 Stmt ¶ 48). After being hired, however, the guards had minimal contact with A–O, only verifying with a phone call or text message that they were at their shift. (PX47 at 28:5–8; PX56 24:6–14). Some guards never even met DePompo in person. (PX55 at 61:10–14; PX61 at 15:2–5; PX62 at 23:11–19, 56:13).

Guards were not asked to perform at AT & T stores any services other than armed security of the premises. (PX52 at 79:18–23, 172:10–18; Mancebo Decl. at ¶ 15; Mendoza Decl. at ¶ 12; Cruz Decl. at ¶ 14.) But some guards did on occasion help with moving boxes (PX53 at 69:4–14), moving merchandise in the store (PX54 at 56:16–57:3), taking out the garbage (PX55 at 50:22–51:12; PX56 at 77:1–11; PX57 at 40:2–9), answering customer questions (PX55 at 63:25–64:20), assisting customers with using the automated payments machine (PX56 at 71:7–23), shoveling the sidewalk (PX56 at 77:20–24) and assisting with deliveries (PX63 at 52:14–22) on their own volition. Some guards also greeted customers when they came into the store. (PX26; PX54 at 73:22–74:20; PX55 at 63:15–24; PX57 at 61:2–10; PX60 at 39:20–40:4, 77:12–18). Guards were expected to wear a suit and tie, or a sweater and slacks. (Defs. Counter statement ¶ 51). The guards wore nothing that identified them as A–O employees or AT & T employees. (*Id.*)

AT & T store managers told guards that food and drink were not permitted on the sales floor and directed one guard to eat in the front of the store due to the number of robberies. (*See* Pltfs. Rule 56.1 Stmt ¶ 38).

In certain cases, store managers provided the guards—including Plaintiffs Alicea and Miranda—with the key to deactivate the display phone alarm system. (PX57 at 39:19–40:6; PX54 at 74:10–17; Cruz Decl. at ¶ 11; Mendoza Decl. at ¶ 9; Mancebo

Decl. at ¶ 14.) or provided guards with the keys to the stores. (PX59 at 27:4–14; PX56 at 49:19–25). The manager instructed the guards how to use the alarm key. These keys were always returned to the store manager at the end of the night. (*Id.*)

AT & T maintained no records of guard attendance or hours worked and received only invoices from Gladius reflecting the number of hours that unspecified guards were purportedly assigned to and present at each store. (PX52 at 53:5–20, 65:18–66:15).

AT & T paid Gladius for security services, but the guards never submitted their invoices to AT & T. Instead, they submitted the invoices directly to DePompo. (*See* Defs. Counterstatement 132).

A–O had the ability to place guards at businesses other than AT & T and occasionally did so. (PX47, DePompo Tr. 1 at 34:5–12 (security for clothing sample sales in New York City), 44:2–11 (providing guard for a pipeline company in New Jersey)). These projects however were short-term projects only requiring 1 or 2 guards.

*Plaintiff–Specific Facts About AT & T Guard Service*

Plaintiffs Grenawalt, Miranda and Alicea are all former law enforcement officers who have worked part-time or full-time as security guards at various entities, including AT & T. (*See* PX54 19:1–10, 48:7–14; PX56 at 14:17–16:9; PX57 31:7–33:21.) Plaintiffs all were paid by A–O on a form 1099 basis. (PX56 at 18:3–11, PX57 at 12:20–13:8, 38:21–39:6, PX54 at 59:25–60:16.) However, Miranda was paid with W2s for two paychecks. (PX54 at 62:7–11).

a. Plaintiff Grenawalt

In 2007, Plaintiff Grenawalt began providing armed security services at AT & T

retail stores through A–O and DePompo, a former colleague at the New York City Police Department. (PX56 at 62:20–25). Grenawalt did not provide his resume or licenses directly to AT & T. (*Id.* at 19:2–6, 20:5–21:12). Grenawalt worked at no less than four different AT & T stores. (*Id.* at 25:23–25, 26:5–11, 38:24–39:3). Grenawalt paid for his New York State armed guard license out of pocket and also used his own gun, for which he personally maintained the permit. (*Id.* at 18:17–19, 1:17–84:3).

In terms of scheduling, except if he was running late to an assignment, Grenawalt never contacted an AT & T store manager directly, and the AT & T store managers never contacted him directly. (*Id.* at 54:4–10). Grenawalt reported the hours that he worked at AT & T stores directly to A–O, and never to AT & T. (*Id.* at 24:22–24).

At some point in 2007, an AT & T store manager informed A–O that Grenawalt was drinking alcohol during lunch breaks. (PX47 at 99:24–101:12). A–O moved him to a different AT & T location initially, but, ultimately, he ceased providing security at AT & T stores altogether and took a job with a different security company. (*Id.;* PX56 15:13–23, 38:24–39:19). In 2009, Grenawalt was again contacted, and ultimately retained, by A–O to provide security services at AT & T stores. (PX56 at 15:24–16:9). Grenawalt provided security services to AT & T stores through Stone Security for about four days but left because Stone Security was giving him few hours and assigning him to different stores. (*Id.* at 34:14–35:10, 36:2–37:22).

b. Plaintiff Miranda

Plaintiff Miranda submitted personal information only to A–O and was subsequently given a post at an AT & T store by A–O. (*Id.* at 77:10–13). Miranda worked at no less than ten AT & T stores. (PX54 at 22:6–15). Miranda testified that he was

personally responsible for maintaining his state-issued armed guard license. (*Id.* at 67:20–23), but Miranda was not licensed to carry a firearm. (*Id.* at 77:2–79:11). During the first few months that he provided guard services at AT & T stores, Miranda had the AT & T store managers confirm to A–O the hours that he worked at an AT & T store. (*Id.* at 30:14–32:14). Afterwards, he reported his work hours at AT & T stores to A–O without confirmation from any AT & T store manager. (*Id.*) Besides AT & T, A–O placed him for guard work at Saks Off Fifth Avenue. (*Id.* at 19:1–10). After Stone Security replaced A–O, Miranda continued to provide security services to AT & T locations, but after a short time left to work for another security company, because his hours were reduced and he was only used as a replacement guard when regularly scheduled guards took breaks. (*Id.* at 42:9–43:23,48:7–14).

c. Plaintiff Alicea

Plaintiff Alicea began providing security services at AT & T stores in 2009. (PX57 at 22:19–24). Alicea worked at no less than 33 different AT & T stores. (*Id.* at 35:17–36, 36:24–37:6). Alicea testified that he personally paid for the necessary state-sponsored training to maintain his license and that he took CPR classes on his own initiative. (*Id.* at 14:5–15:10, 16:6–18, 16:22–17:11). Madison Security issued to Alicea the gun that he carried while providing armed security services at AT & T stores. (*Id.* at 67:5–25, 69:5–11). Alicea applied for a security post through A–O. (*Id.* at 11:6–13) and was never interviewed by anyone at AT & T (*Id.* at 15:–7; 16:3–5; 16:16–18; 17:6–17:15).

Alicea admitted that DePompo informed Alicea of his schedule, but ultimately that the hours he worked were tied to the store hours. (Pltfs. Counterstatement ¶ 256). A–O fired Alicea after he asked DePompo

for a day off. (*Id.* at 33:22–35:7). Since then, he has not provided guard services at any AT & T stores. (*Id.*)

*Gladius Terminates Contract With A–O*

Gladius terminated the ICA in February 25, 2011 pursuant to the provisions found in Article 2 of the ICA. (*See* Isham Decl. at ¶ 7; *Id.* Ex. 1–C; *Id.* Ex. 1–B, ICA at § 2.2). At the time of termination, Gladius had paid the A–O Defendants millions of dollars in coordination fees and guard-related invoices over the life of the ICA. (See Isham Decl., Ex. 1 at ¶ 7). Gladius alleges that the A–O defendants engaged in over-billing and intentional destruction of billing records for the guards. By Gladius's estimate, A–O paid the guards approximately $1.6 million, but invoiced Gladius for almost $2.3 million in hourly guard services. DePompo admitted that she routinely destroyed the guards' invoices and any back-up data for the guards' hours after she entered the total dollar amounts for each invoice into ADP, an online bill tracking system. (PX47 at 87:16–87:24, 110:10–110:14, 155:16–155:23).

In addition, Gladius claims that the A–O Defendants provided at least some unarmed guards, in contravention of the purported understanding between A–O Defendants and Gladius (and separately between Gladius and AT & T) that only armed off-duty officers would be on detail at AT & T. On February 26, 2011, the A–O Defendants notified AT & T that an unarmed guard was in place at an AT & T retail location. *See id.* Gladius believes that this and other emails from A–O Defendants to AT & T were an effort by A–O Defendants to disparage it in AT & T's eyes and compete against Gladius for the AT & T contract, in violation of the non-compete provision of the ICA. Gladius alleges similar disparagement throughout February and March 2011.

*Gladius Principal Forms Centuria*

Sometime in 2009 or 2010, Herbert Isham formed Centuria as a separate security company due, in part, to certain accounting advantages offered by a C corporation over an S corporation. Plaintiffs allege Isham was additionally motivated to avoid bad publicity caused by the indictment of his business partner, Mr. Branch. (PX46 at 19:8–11, 31:11–15). Centuria is incorporated under the laws of the State of Texas and maintains an operations office in Tyler, Texas and an executive office in Southlake, Texas. (*Id.* at 8:3–8:11; Second Am, Compl. at ¶ 27). Centuria currently provides some office space to Gladius. (PX46 at 26:6–27:17). Additionally, many of the current Centuria employees had worked for Gladius prior to transitioning to Centuria. (Pltfs. Rule 56.1 Stmt ¶¶ 22–25). Although it no longer provides security services, Gladius is still in business primarily collecting past due receivables and outstanding debts. (*See* PX46 at 19:13–19:21). Centuria paid at least one of A–O's invoices. (*Id.* at 76:17–77:8; PX47, DePompo Tr. 1 at 132:13–133:19).

*Centuria Meets AT & T*

Centuria eventually entered into a separate contract with AT & T to replace Gladius as AT & T's provider of armed security services for stores located in the New York City and New Jersey markets. (PX46 at 21:5–21:8, 29:25–30:18).[3] Unlike Gladius, which used A–O, Centuria primarily subcontracts with Stone Security to

---

**3.** Although Defendants' Statement of Material Facts claims that Centuria entered its contract with AT & T in May 2011, Plaintiffs Grenawalt and Miranda worked for Stone Security, albeit temporarily, after A–O was terminated in February 2011. (PX56 at 34:14–35:10, 36:2–37:22; PX54 at 42:9–43:23, 48:7–14).

recruit, hire, pay and manage the security guards that are placed at AT & T retail stores. (*Id.* at 34:1–34:12). Isham contends that Centuria hired Stone Security to provide a better and more professional level of service than A–O. (*Id.* at 35:20–36:4).

*A–O Fails to Pay Guards*

The guards were not paid for the last two months of their employment: from January 28, 2011 through February 25, 2011. (Pltfs. Rule 56.1 Stmt ¶ 69). On May 26, 2011, the Department of Labor sent a letter to DePompo concerning a recent investigation into FLSA violations at A–O. The guards were owed overtime back wages, back wages, and total unpaid wages in the amount of $68,815.89. (PX50). This suit followed.

## DISCUSSION

I consider first whether AT & T is a joint employer for the purposes of FLSA and NYLL. Then I consider the question of whether to compel arbitration over Plaintiffs' third-party beneficiary and successor-in-interest claims against Gladius and Centuria.

### I. *Joint Employment*

#### A. Summary Judgment Standard

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). There is no issue of material fact where the facts are irrelevant to the disposition of the matter. Speculation, conclusory allegations and mere denials are not enough to raise genuine issues of fact. *National Union Fire Ins. Co. of Pittsburgh, Pa. v. Walton Ins. Ltd.*, 696 F.Supp. 897, 900 (S.D.N.Y.1988). To avoid summary judgment, a party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). On cross-motions for summary judgment, the court must consider each motion independently of the other and when evaluating each, the court must consider the facts in the light most favorable to the non-moving party. *Sciascia v. Rochdale Village, Inc.*, 851 F.Supp.2d 460 (E.D.N.Y.2012) (citing *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir.1993)); *Zaccaro v. Shah*, 746 F.Supp.2d 508 (S.D.N.Y.2010), *See also Lopez v. SB. Thomas, Inc.*, 831 F.2d 1184, 1187 (2d Cir.1987) ("In testing whether the movant has met this burden, the Court must resolve all ambiguities against the movant,")

#### B. Relevant Law

The FLSA requires that "[e]very employer shall pay to each of his employees ... wages not less than" the prevailing minimum wage. 29 U.S.C. § 206(a)(1). FLSA further provides that "no employer shall employ any of his employees ... for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). Similarly, the NYLL requires that "[e]very employer shall pay to each of its employees for each hour worked a wage of not less than" the prevailing minimum wage. N.Y. Labor Law § 652(a). NYLL further prohibits employers from No employer shall make "any deduction from the wages of an employee," except in accordance with state and federal law or if expressly authorized in writing by the employee. *See* N.Y. Labor Law § 193.

I will first consider whether AT & T is a joint employer under the FLSA. The FLSA and NYLL define employment almost identically. *Compare* 29 U.S.C. § 203(g) ("'Employ' includes to suffer or permit to work."), *with* N.Y. Lab. Law § 2(7) ("'Employed' includes permitted or suffered to work."). Consequently, courts in this circuit "hold that the New York Labor Law embodies the same standards for joint employment as the FLSA." *Paz v. Piedra*, No. 09 Civ. 03977(LAK)(GWG), 2012 WL 121103, at *5 (S.D.N.Y. Jan. 12, 2012) (citing *inter alia, Chen v. St. Beat Sportswear, Inc.*, 364 F.Supp.2d 269, 278 (E.D.N.Y.2005) (citing cases)).

In relevant part, FLSA defines "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee ..." 29 U.S.C. § 203(d). "Because the statute defines employer in such broad terms," ultimately, it "offers little guidance on whether a given individual is or is not an employer." *Herman v. RSR Security Services Ltd.*, 172 F.3d 132, 139 (2d Cir.1999). Instead, FLSA "stretches the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles, in order to effectuate the remedial purposes of the act." *Barfield v. New York City Health and Hospitals Corp.*, 537 F.3d 132, 141 (2d Cir.2008) (internal citations and quotation marks omitted). Accordingly, the determination of whether an employer-employee relationship exists for purposes of the FLSA should be grounded in "economic reality rather than technical concepts" determined by reference not to "isolated factors, but rather upon the circumstances of the whole activity." *Id.* (citing *Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 33, 81 S.Ct. 933, 6 L.Ed.2d 100 (1961); *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947)). The goal of the economic reality test, and of this court considering a finding of joint employment, is "expos[ing] outsourcing relationships that lack a substantial economic purpose, but it is manifestly not intended to bring normal, strategically-oriented contracting schemes within the ambit of the FLSA." *Zheng v. Liberty Apparel Co. Inc.*, 355 F.3d 61, 76 (2d Cir. 2003).

In *Carter v. Dutchess Community College*, the Second Circuit identified four factors relevant to the joint employment inquiry: "'whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment records.'" 735 F.2d 8, 12 (2d Cir.1984) (quoting *Bonnette v. Calif. Health & Welfare Agency*, 704 F.2d 1465, 1470 (9th Cir.1983)) (collectively, "*Carter* factors").

In *Zheng*, the Second Circuit acknowledged that while the *Carter* factors exemplify formal control, they might be inadequate to determine "the circumstances of the whole activity viewed in light of economic reality," 355 F.3d at 71; *id.* at 69 ("We did not hold ... that a positive finding on those four factors is *necessary* to establish an employment relationship," only that they "can be sufficient.") Thus, district courts should consider other factors as a measure of functional control (collectively, "*Zheng* factors"):

(1) whether [the putative joint employer]'s premises and equipment were used for the plaintiffs' work; (2) whether the Contractor Corporations had a business that could or did shift as a unit from one putative joint employer to another; (3) the extent to which plaintiffs performed a discrete line job that was integral to [the putative joint employer]'s process of

production; (4) whether responsibility under the contracts could pass from one subcontractor to another without material changes; (5) the degree to which the [putative joint employer] or [its] agents supervised plaintiffs' work; and (6) whether plaintiffs worked exclusively or predominantly for [the putative joint employer].

*Id.*

Lastly, a court is "also free to consider any other factors it deems relevant to its assessment of the economic realities." *Id.* at 72. While this is a fact-intensive inquiry, summary judgment is appropriate in favor of some entities alleged to be joint employers. *Jean–Louis v. Metropolitan Cable Communications, Inc.,* 838 F.Supp.2d 111, 119 n. 4 (S.D.N.Y.2011) ("Nothing … casts doubt on the propriety of treating joint employment as a question of law where there are no genuine issues of material fact requiring a jury trial.")

### C. Formal Control (*Carter*) Factors

#### 1. Power to hire and fire employees

■ The first *Carter* factor is whether the purported joint employer had the power to hire and fire Plaintiffs. *Carter,* 735 F.2d at 12. Plaintiffs contend that AT & T had the power to hire and fire Plaintiffs because store managers could request that specific store managers take shifts at a store and conversely, could request that some guards not be scheduled for a particular store. But this does not, without more, rise to the level of ability to hire and fire. For complaints about guards, AT & T would pass along the message to Gladius who would inform A–O of the need for another guard. In the most standard way of beginning an employment relationship, AT & T's interactions with Plaintiffs are nonexistent: AT & T does not review resumes or otherwise aid in the selection of

guards. In short, AT & T had no role in the initial decision to employ the guards.

There is more ambiguous evidence that AT & T had a hand in whether a guard could be fired. (*See* PX47 DePompo Tr. 1, at 97:23–103:21). AT & T did not fire any guard directly. DePompo most clearly stated that she did not fire anyone (*id.* 97:23–98:26), but then explained that sometimes she would have to tell guards their "services are no longer needed," (*id.* at 98:5–22). These requests, according to DePompo, came from Gladius or a store manager. (*Id.*) However, it seems that the ultimate decision to fire a guard remained with DePompo, not AT & T or even Gladius. For instance, instead of firing a guard, she might simply have him relocated to another store. (*Id.* at 102:9–21). This was certainly the case with Grenawalt. Even after AT & T reported directly to DePompo that Grenawalt had been drinking on the job, Grenawalt "removed himself," then returned to A–O—and AT & T—months later:

Q Did the manager ask you to replace [Grenawalt]?

A The inference was there, I don't remember if he actually did ask me. I would assume he did.

Q As a result of that conversation what would you do?

A At that point I think I called John and I spoke to him and he understood, I don't think I had to verbally say to him you are drinking, he knew and he removed himself. I may have moved him to a couple of locations because I knew he needed but it didn't work out for a while.

Q He wasn't fired permanently at that point?

A That is correct. I like John. I said if he straightens himself out. He called me a couple months later. I said, you

okay? He said yeah, I said we'll give you a try. I have no problem with that.

PX47, DePompo Tr. 1, at 100:17–101:12.

Notably, AT & T did not have a say when A–O allowed Grenawalt to return. Because the incident did not result in Grenawalt's permanent termination even for such a serious offense, it is debatable whether AT & T actually had the authority to fire the guards.

The reality that AT & T did not have the authority to fire employees is made more apparent when compared to *Jean–Louis.* There, the court found no evidence of authority to hire and fire where the purported joint employer, a cable and telecommunications provider, could de-authorize a particular technician of the installation subcontractor from providing in-home cable installations for failure to ground, a process to reduce the risk of electrocution. *Jean–Louis,* 838 F.Supp.2d at 125. The court reasoned that de-authorization was a "limited power" even though the contractor "would as a matter of course terminate any employee" who did not meet the safety standards. *Id.*

Here, the assertion that AT & T had the authority to fire the guards is even less reasonable where a specific store location could request that a guard not be scheduled there and the guard continued to work for A–O and guard AT & T stores, albeit at a different location. In short, the guards were not, as a general rule, categorically banned from doing security at AT & T. Grenawalt actually returned to AT & T for a while and for a few days when Stone Security was the new security subcontractor. Thus, AT & T did not have the power to hire and fire the guards, and the first *Carter* factor does not favor a finding of joint employment.

## 2. Supervision and control of employee work schedules or conditions of employment

The second *Carter* factor is whether the purported joint employer supervises and controls employee work schedules or conditions of employment. *Carter,* 735 F.2d at 12.

### a. Employment Work Schedules

Given the nature of providing security services, they are most useful when provided during the hours a store is open. This common-sense principle does not mean that AT & T controls Plaintiffs' work schedules. *Jean–Louis,* 838 F.Supp.2d at 126 (requiring installation jobs to take place during set "time windows" was not control over work schedule where installation subcontractor, rather than defendant, "decides which technicians will work on which job and whether a technician will work on any jobs in that period at all"); *see Moreau v. Air France,* 356 F.3d 942, 950 n. 5 (9th Cir.2004) (affirming summary judgment that airline was not the ground handlers' joint employer because airline scheduled its flight into and out of the airline "which necessarily indicated when the services were to be performed").

### b. Conditions of Employment

■ Courts should beware that "the degree to which the defendants supervise the plaintiffs' work ... can be misinterpreted to encompass run-of-the-mill subcontracting relationships." *Zheng,* 355 F.3d at 74. Thus, "supervision with respect to contractual warranties of quality and time of delivery has no bearing on the joint employment inquiry, as such supervision is perfectly consistent with a typical, legitimate subcontracting arrangement." *Id.* at 75. Taking measures to ensure quality control does not prove control over the conditions of employment. "Quality control and compliance-monitoring that stem from the nature of the business—

that is, from the nature of the goods or services being delivered—are qualitatively different from control that stems from the nature of the relationship between the employees and the putative employer." *Godlewska v. HDA,* 916 F.Supp.2d 246, 260 (E.D.N.Y.2013) (citing *Jacobson v. Comcast Corp.,* 740 F.Supp.2d 683, 691–92 (D.Md.2010) (internal quotation marks and alteration omitted)). AT & T has an interest in ensuring customer service is optimal in its stores and can take measures to maintain an air of professionalism without thereby incurring liability as a joint employer.

Rather, the pertinent inquiry is whether the purported joint employer exercised control over the employee's day-to-day conditions of employment. *Godlewska,* 916 F.Supp.2d at 259–60. While the question of controlling day-to-day conditions of employment appears to lean toward a finding of joint employment as interaction onsite as AT & T stores was abundantly more important than interaction with A–O, such a connection is illusory. Plaintiffs present evidence that some guards were asked to take short lunch breaks or to hold off on a break until the store was less busy. These requests were completely aligned with ensuring the highest quality of security service. Plaintiffs further contend that some agents never met DePompo. However, in the age of technology, an in-person meeting with DePompo was not a necessary prerequisite for Plaintiffs to receive their assignments and perform security detail at a client site. Finally, virtually all the evidence supports the conclusion that A–O was the entity that advised guards of their assignments, not AT & T. This factor weighs against a finding of joint employment.

### 3. Determination of rate and method of payment

The third *Carter* factor is whether the purported joint employer determines rate and method of payment. The only evidence Plaintiffs proffer is the fact that AT & T paid Gladius for security services. But this is not the same as determining the rate of payment where AT & T did not calculate the individual guards' hours and compensate Gladius accordingly. *See Jean–Louis,* 838 F.Supp.2d at 129–130 ("To be sure, any company A that provides revenue to company B affects what company B pays its employees, but the test is whether a putative joint employer determines pay rates, not whether it affects them."). *Cf. Torres–Lopez v. May,* 111 F.3d 633, 643 (9th Cir.1997) (defendant grower increasing compensation to farm labor contractor's compensation during the first picking of the cucumbers to allow plaintiff farmworkers to draw higher wages was determining pay rates).

AT & T likewise was not responsible for the method of payment to the guards. There is extensive evidence that there was no systematic basis for some guards receiving W2s and others receiving 1099 forms. *See e.g.,* PX54 at 61:24–62:20 (Miranda testifying DePompo changed payment from a W2 to a 1099 without reason). This factor weighs against a finding of joint employment.

### 4. Maintenance of employment records.

The fourth *Carter* factor is whether the purported employer maintains employment records. The most relevant employment records are those concerning hours worked. *Godlewska,* 916 F.Supp.2d at 262 (citing *Barfield,* 537 F.3d at 144). Plaintiffs present no evidence that AT & T kept employment records for the guards provided by A–O. Their only evidence of employment records refers to an informal logbook instituted by Stone Security, the security company Gladius subcontracted with after ending its relationship with A–O. Furthermore, Plaintiffs do not allege that the log-

book included a calculation of hours worked by each guard. Thus, this factor weighs against a finding of joint employment.

### D. Functional Control (*Zheng*) Factors

#### 1. Whether [the putative joint employer]'s premises and equipment were used for the plaintiffs' work

The first *Zheng* factor is "whether [the putative joint employer]'s premises and equipment were used for the plaintiffs' work." *Zheng*, 355 F.3d at 72. Although "shared premises" is not "anything close to a perfect proxy for joint employment" because it is "perfectly consistent with a legitimate subcontracting relationship[ ], the factfinder can use these readily verifiable facts as a starting point in uncovering the economic realities of a business relationship." *Id.*

Because Plaintiffs were security guards, it is undisputed that they worked on site at AT & T stores. There is more dispute, however, as to whether AT & T provided equipment for the Plaintiffs to use. The most important piece of equipment, for an armed guard—a gun—was never licensed or sponsored by AT & T. Some, but not all, of the plaintiffs received a key to disarm the security alarms. The guards who received the key admit that they had to return it at the end of the night.

One fact, that AT & T provided a copy of their post-guard orders (PX25) for dissemination by A–O to the guards could suggest an employer relationship. On one hand, this distinction shows that there is a difference between A–O guards and AT & T guards. On the other, it could indicate a desire to synchronize A–O's practices with its own with those of AT & T in-house guards. On balance, viewed in favor of Plaintiffs, this factor favors a finding of joint employment.

#### 2. Whether the [Plaintiffs] had a business that could or did shift as a unit from one putative joint employer to another

The second *Zheng* factor is "whether the [Plaintiffs] had a business that could or did shift as a unit from one putative joint employer to another." *Zheng*, 355 F.3d at 72. Plaintiffs as security guards could take on non-AT & T security jobs, either on their own or through A–O as DePompo sometimes had non-AT & T security jobs to offer plaintiffs. Even though these other jobs were rare, the fact that A–O by default only had one customer was not a result of any control or exclusivity that AT & T had or required. Additionally, Plaintiffs' argument would have the perverse effect of discouraging businesses from hiring subcontractors because prospective businesses would never be sure that they were the only client, an effect that would unnecessarily "bring normal, strategically-oriented contracting schemes within the ambit of the FLSA." *Id.* at 76. For these reasons, the second *Zheng* factor weighs against a finding of joint employment.

#### 3. The extent to which plaintiffs performed a discrete line job that was integral to [the putative joint employer]'s process of production

The third *Zheng* factor is "the extent to which plaintiffs performed a discrete line job that was integral to [the putative joint employee's] process of production." *Zheng*, 355 F.3d at 72. For this analysis, *Zheng* "recognized a spectrum spanning from, on one end, 'piecework on a producer's premises that requires minimal training or equipment, and which constitutes an essential step in the producer's integrated manufacturing process,' and, on the other end, 'work that is not part of an integrated production unit, that is not performed on a predictable schedule, and that requires specialized skills or expensive technolo-

gy.'" *Jean–Louis*, 838 F.Supp.2d at 134 (citing *Zheng*, 355 F.3d at 73).

As security guards, plaintiffs did not perform a discrete line job but Plaintiffs still argue that they were integral to AT & T's business by preventing theft. AT & T retorts that Plaintiffs are not an "integral" part of the provision of telecommunication services, AT & T's main business. While security services and theft prevention were likely very important to AT & T and undoubtedly part of the reason it sought security for some AT & T. locations, this motivation is not unique to AT & T's business. Neither was it entirely indispensable to AT & T as many of the stores operated without a security presence. This factor weighs against a finding of joint employment.

4. Whether responsibility under the contracts could pass from one subcontractor to another without material changes

The fourth *Zheng* factor is "whether responsibility under the contracts could pass from one subcontractor to another without material changes." *Zheng*, 355 F.3d at 72. The fourth factor is satisfied if the contractors are truly fungible such that "the same employees would continue to do the same work in the same place." *Jean–Louis*, 838 F.Supp.2d at 135. The subject of inquiry is the purported employee: "this factor weighs in favor of a determination of joint employment when employees are tied to an entity ... rather than to an ostensible direct employer ..." *Id.* at 74; *Chen*, 364 F.Supp.2d at 286 (citations omitted).

Here, A–O and its guards proved easily interchangeable when Gladius hired Stone Security to replace A–O, as its subcontractor for guard services in AT & T stores. While some of the guards from A–O continued on with Stone Security (and not all of Plaintiffs did), the relationship was short-lived. Stone imposed stricter rules than had been in place with A–O and paid substantially less. (PX56 at 34:14–35:10, 36:2–37:22; PX54 at 42:9–43:23, 48:7–14). Thus, although some of the faces were the same, there were changes in how the guard company was operated and at least some, if not most, of the guards were new hires. That said, Isham's assertion that Stone provided better service does not offer much in the way of substantiating this claim, as it is a subjective conclusion against an entity it is currently suing. This factor weighs against a finding of joint employment.

5. The degree to which the putative joint employer or its agents supervised plaintiffs' work

The fifth *Zheng* factor is "the degree to which the [putative joint employer] or [its] agents supervised plaintiffs' work." *Zheng*, 355 F.3d at 72. As with the second *Carter* factor, although Plaintiffs generally checked in with the store manager upon arrival or alerted the AT & T manager when they were running late, there is not much evidence that AT & T supervised plaintiffs in providing security services. Overall, Plaintiffs concur that they were aware of what they were supposed to do in terms of providing security. Plaintiffs cite to the fact that they were requested to stand in a certain location to best deter theft. AT & T also asked the guards to take breaks at less busy times. Furthermore, AT & T exercised some supervision to make sure that Plaintiffs did not do activities that would be frowned upon in any professional setting: flirtation with customers, consumption of alcoholic beverages and watching pornography on company computers, But such monitoring amounts to nothing more than quality control measures, which have "no bearing on the joint employment inquiry." *Zheng*, 355 F.3d at 75. This factor weighs against a finding of joint employment.

### 6. Whether plaintiffs worked exclusively or predominantly for the putative joint employer

The sixth *Zheng* factor is "whether plaintiffs worked exclusively or predominantly for [the putative joint employer]." *Zheng*, 355 F.3d at 72. While there is some overlap with the second *Zheng* factor (whether [A–O] had a business that could or did shift as a unit from one putative joint employer to another), they are not entirely coextensive. *Id.* at 75 n. 12 ("[F]actor (6), but not factor (2), would weigh in favor of joint employment if a subcontractor worked solely for a single client but had the ability to seek out other clients at any time,") Such is the case here where A–O operated almost exclusively to fulfill Gladius's contract with AT & T, "albeit by its own choice." *Lawrence v. Adderley Industries, Inc.*, No. CV–09–2309 (SJF)(ETB), 2011 WL 666304, at *10 (E.D.N.Y. Feb. 11, 2011). This factor favors a finding of joint employment.

### E. Additional Factors

Applying the *Carter* and *Zheng I* factors, it is clear that the relationship between the guards and AT & T was one of subcontracting, not joint employment. Few factors weigh conclusively in favor of joint employment. AT & T's power to hire and fire is murky as AT & T by no means had the last word in termination decisions. Plaintiffs were on site at AT & T stores and some were given keys, returned at the end of their shifts, to operate the alarm system and lock the store after closing, but this evidence means little given the nature of a security guard position. Lastly, as A–O guards, Plaintiffs worked primarily or exclusively in AT & T stores. On the whole, this favorable evidence misses the larger point that the guards were not so integrated into AT & T as to constitute an employer relationship instead of a "legiti-mate subcontracting arrangement." *Zheng*, 355 F.3d at 75.

However, the court is "also free to consider any other factors it deems relevant to its assessment of the economic realities." *Id.* at 72.

In particular, the Plaintiffs contend that *Jean–Louis* is not a proper comparison because the plaintiffs there performed their jobs in customers' homes rather than at the Time Warner site, But this distinction does not mean much. Security services are obviously going to be performed on-site. The more salient feature is that both the plaintiffs in *Jean–Louis* and here performed a service in close contact and communication with the purported joint employer.

Furthermore, compared against the other cases involving security guards that Plaintiffs cite (Dkt. No. 173, Pltfs. AT & T Reply at 17–18), the facts in this case do not merit a finding of joint employment. *Herman v. RSR Security Services Ltd.*, 172 F.3d 132 (2d Cir.1999), while still good law, did not assess joint employment under the *Zheng* factors. More to the point, *Herman* concerned a different situation altogether, where the chairman of a security firm who "could have dissolved the company" overlooked warning signs of FLSA violation. *Id.* at 140, Thus, the court found that he was liable as a joint employer. AT & T did not have such power over A–O. Indeed, when A–O was still a party in this suit, its claims were not directed at AT & T, only Gladius and its purported successor, Centuria.

*Schultz v. Capital International Security, Inc.*, 466 F.3d 298 (4th Cir.2006) considered the joint employment status of a Saudi Prince over the agents that performed his security detail. Wherever the Prince went, his agents followed. They went with him, if assigned, on trips to the Middle East and domestically, performed general

housekeeping tasks around his home. This is a very different situation from the Plaintiffs who concededly were not even hired to work in all of AT & T's New York locations, only a select few. The occasional assistance with opening a door for a delivery person, taking out the trash, or showing a customer how to use the auto-pay system was not required by AT & T but was done at the particular guard's volition. *E.g.,* PX56 at 71:10–72:3 (personal knowledge of how to use the AT & T auto-pay machines because he is an AT & T customer). Furthermore, on the whole, most guards did not engage in such activities.

Lastly, although Plaintiffs categorize Title VII's standard as "more restrictive," it does not involve as fact-intensive an analysis as a FLSA claim. Indeed, the *Forsythe* court using the Title VII factors considered only "commonality of hiring, firing, discipline, pay, insurance, records and supervision." *Forsythe v. New York City Dep't of Citywide Admin. Servs.*, 733 F.Supp.2d 392, 398 (S.D.N.Y.2010) (finding joint employment under Title VII). To the extent these inquiries under Title VII reflect on this Court's analysis under FLSA, Plaintiffs' argument is unavailing as I have considered these issues and found Plaintiffs wanting.

Under the law of this Circuit, AT & T was not a joint employer of Plaintiffs and their proposed class under the FLSA. By the same standard, AT & T was not a joint employer of Plaintiffs under the NYLL. Having found that AT & T is not a joint employer, AT & T's motion for summary judgment dismissing Plaintiffs' FLSA and NYLL claims (Dkt. No. 165) is granted. The alternate argument that Plaintiffs are independent contractors need not be considered and AT & T's motion to dismiss Plaintiffs' NYLL claims and motion for class certification are denied as moot.

## II. *Third–Party Beneficiary Claims*

Plaintiffs allege a third-party beneficiary relationship with Gladius and Centuria, as Gladius's purported successor-in-interest. Plaintiffs argue that the third-party beneficiary relationship arises out of an unspecified oral agreement between Gladius and DePompo, on A–O's behalf, at some point prior to the ICA. To the contrary, Gladius alleges that the claim is based on the Independent Contractor Agreement (ICA) entered between Alpha–Omega Protection Corporation and Gladius on June 24, 2008 and thus must be arbitrated pursuant to ICA, § 7.

### A. Standard of Review—Arbitrability

Because "the Federal Arbitration Act carefully limits the role of the courts in considering motions to compel arbitration," *Conticommodity Servs. Inc. v. Philipp & Lion,* 613 F.2d 1222, 1224 (2d Cir.1980), we consider arbitrability first as it directly impacts our jurisdiction over the remainder of the claims between Plaintiffs, Gladius and Centuria.[4] "Prior to arbitration, a court's role is severely circumscribed; it can only undertake two inquiries: whether or not the company was bound to arbitrate and what issues must it arbitrate.... Questions concerning the procedural pre-

---

**4.** In their summary judgment reply brief, Plaintiffs allege for the first time that Gladius waived their arbitration claim for having litigated this case for so long. As Gladius notes, however, Plaintiffs' attempt at a bait-and-switch is apparent and clearly contrary to Judge Berman's decision to dismiss Gladius's pending motions to dismiss as moot, *see* Dkt. No. 94, and his command that the parties address arbitrability at the summary judgment stage, Dkt. No. 96, at 1–2. There is no unfair prejudice to Plaintiffs to consider arbitration where Gladius has more than once asserted that this matter should be arbitrated and was instructed specifically to reassert those arguments on summary judgment. Gladius has not waived the argument and we will address it here.

requisites to arbitration, however, are to be decided by the arbitrator." *Dry Harbor HRF Inc. v. Local 1199, Drug, Hosp. and Health Care Employees Union, RWDSU/AFL–CIO,* No. 87 Civ. 3444, 1988 WL 8615, at *3 (E.D.N.Y. Jan. 15, 1988).

 On a motion to compel arbitration, the court must typically first decide whether the parties agreed to arbitrate. *Schnabel v. Trilegiant Corp.,* 697 F.3d 110, 118 (2d Cir.2012) ("Inasmuch as the arbitrator has no authority of any kind with respect to a matter at issue absent an agreement to arbitrate, the question of whether such an agreement exists and is effective is necessarily for the court and not the arbitrator."). The summary judgment standard is appropriate in cases where the District Court is required to determine arbitrability.[5] *Syncora Guarantee Inc. v. HSBC Mexico, S.A.,* 861 F.Supp.2d 252, 258 (S.D.N.Y.2012) (quoting *General Motors Corp. v. Fiat S.p.A,* 678 F.Supp.2d 141, 145 (S.D.N.Y.2009)).

 If the court finds the agreement to arbitrate valid, it must then determine whether the dispute falls within the scope of an agreement's arbitration clause and classify the particular clause as either broad or narrow. *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.,* 252 F.3d 218, 224 (2d Cir.2001) (citing *Mehler v. Terminix Int'l Co.,* 205 F.3d 44, 49 (2d Cir.2000)). When the arbitration clause is broad enough that it includes disputes "of any nature or character" or "any and all disputes," all questions or disputes arising thereunder are within the exclusive jurisdiction of an arbitrator. *Jillian Mechanical Corp. v. United Service Workers Union Local 355,* 882 F.Supp.2d

358, 368 (E.D.N.Y.2012). With a broad arbitration agreement, there is a presumption of arbitrability, overcome only if "it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." *Duane Street Assocs. v. Local 32B–32J,* No. 00 Civ. 3861, 2000 WL 802889, at *2 (S.D.N.Y. June 21, 2000) (quoting *WorldCrisa Corp. v. Armstrong,* 129 F.3d 71, 74 (2d Cir.1997)).

 Gladius seeks to compel arbitration against Plaintiffs who notably are not parties to the ICA. This distinction, however, is only a superficial one. A nonsignatory "is estopped from denying its obligation to arbitrate when it receives a 'direct benefit' from a contract containing an arbitration clause." *Am. Bureau of Shipping v. Tencara Shipyard S.P. A.,* 170 F.3d 349, 353 (2d Cir.1999); *Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S.,* 9 F.3d 1060, 1063–1064 (2d Cir.1993) ("While it is true that arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit, we have held that a party may be bound by an agreement to arbitrate even in the absence of a signature [as] ordinary principles of contract and agency determine which parties are bound by an agreement to arbitrate.") (internal quotation marks and citations omitted). At this stage, Plaintiffs are alleging that, as purported third-party beneficiaries, they were supposed to receive a direct benefit—wages. Thus, if their dispute is subject to the arbitration clause, it must be decided in arbitration.[6]

---

5. See discussion of the summary judgment standard, *supra* p. 447.

6. The irony is that if Plaintiffs did not allege to be third-party beneficiaries, they would stand a better chance of not being bound by

the arbitration clause. Assuming *arguendo* that Plaintiffs are third-party beneficiaries as they insist, Plaintiffs are bound by the integrated agreement of A–O and Gladius, which is the ICA. *Zac Smith & Co., Inc. v. Moonspin-*

Without going into the merits of Plaintiffs' third-party beneficiary argument, the material facts are undisputed: A–O and Gladius entered the ICA, an agreement containing an arbitration clause; both A–O and Gladius acknowledge that the ICA was a mere continuation of previous understandings, and not a separate agreement, to provide security services; and Plaintiffs seek recognition of third-party beneficiary status for their actual provision of security services.

Thus, to be successful on their motion to compel, Gladius need only establish that it and A–O intended to arbitrate a dispute about payment to the security guards. A–O, the other party to the ICA, did not object to the arbitration clause or the ICA more generally when it was represented by counsel and cannot do so now that it is not represented by counsel. The only question that remains is whether this dispute falls within the arbitration requirement.

### B. Implied–in–Fact Contracts

▇ Even in the absence of a written contract, it is well-settled that a contract may be implied in fact where inferences may be drawn from the facts and circumstances of the case and the intention of the parties as indicated by their conduct. *Matter of Boice*, 226 A.D.2d 908, 910, 640 N.Y.S.2d 681, 682 (N.Y.App.Div.1996) (citations omitted). "An implied-in-fact contract arises in the absence of an express agreement, and is based on the conduct of the parties from which a fact-finder may infer the existence and terms of a contract." *Ward v. National Geographic*

*Soc.*, 208 F.Supp.2d 429, 437 (S.D.N.Y. 2002) (quoting *AEB & Assocs. Design Group, Inc. v. Tonka Corp.*, 853 F.Supp. 724, 731 (S.D.N.Y.1994)). Unlike an implied-in-law contract "based on equitable principles to operate whenever justice requires compensation be made," an implied-in-fact contract is the same as an express contract, except that assent is not expressed in words, but is implied from the conduct of the parties. *Auto Glass Exp., Inc. v. Hanover Ins. Co.*, 293 Conn. 218, 224, 975 A.2d 1266, 1271 (Conn.2009) (citations omitted).

This case deals with an implied-in-fact contract, evidenced by Gladius and A–O's conduct. There is no doubt that some arrangement to provide security services existed between Gladius and A–O before they signed ICA. For a year and a half before the ICA, Gladius and A–O had an ongoing working relationship. According to DePompo at least, the formalized ICA was a request of Gladius because of their name change (from GPI). But they evinced no desire to change the preexisting terms and both parties agree that certain terms were understand from previous agreements written or otherwise: nothing changed with the adoption of the ICA. When asked to explain the circumstances of signing the ICA, DePompo explained that she was told "nothing is changing" and "everything is still the same [a]t which point [she] had felt comfortable" and "signed it to continue on as a subcontractor." (PX47 at 171:17–172:13).

It is also undisputed that some aspects of the preexisting agreement between A–O

*ner Condominium Ass'n, Inc.*, 472 So.2d 1324 (Fla.Dist.Ct.App. 1st Dist.1985) (holding that a third-party beneficiary's rights depend on, and are measured by, the terms of the contract between the promisor and the promisee, and that the beneficiary was bound thereby to the same extent that the promisee was bound); AMJUR CONTRACTS § 449 ("The

right of a third person for whose benefit a promise is made is affected with all the infirmities of the contract as between the parties to the agreement.") Of course, without a third-party beneficiary claim, Plaintiffs would not have a case against Gladius, and by extension, Centuria.

and Gladius were not reduced to writing, at least not in the ICA. Although these previous agreements were not written down, there was nonetheless a contract implied-in-fact based on (1) Gladius's request that DePompo locate officers who could work security in fulfillment of Gladius's contract with AT & T, (2) DePompo's efforts to coordinate officers to act as security guards for AT & T stores and (3) her subsequent receipt of a $5 per man hour coordination fee and Gladius' financing of her payroll. These facts establish adequate offer, acceptance and consideration.

▆ The story is complicated by the fact that the ICA ostensibly supplements, rather than supplants, the terms of Gladius and A–O's relationship. The ICA, while discussing some terms of the subcontractor arrangement between Gladius and A–O such as nature of the engagement, indemnity, limitations on compensation to A–O as an independent contractor, excluded specific details that both parties to the contract insist were understood terms such as payment mechanism and A–O's coordination fee. However, the ICA unequivocally requires arbitration for "[a]ny controversy or claim arising out of or relating to this Agreement, or the breach of it ..." (PX39, ICA, § 7). If as both DePompo and Gladius stated in their depositions, the ICA was a final statement of the terms therein, then one issue was clearly settled in this brief and wanting contract: the subject of arbitration.

### C. Third–Party Beneficiary Claims Are Related to the ICA and Thus Must Be Handled In Arbitration

▆ The arbitration clause is broad because it intends that any controversy or claim be addressed in arbitration. *Jillian Mechanical Corp.*, 882 F.Supp.2d at 368. Because all the testimony points to the fact that the ICA was nothing but a continuation of the previous implied-in-fact contract, the previous agreements are at a minimum related to the ICA. Any disputes arising from the implied-in-fact contracts, including Plaintiffs' purported status as third-party beneficiaries, thus are related to the ICA and must be settled by arbitration.

Plaintiffs' claim of jurisdiction must also fail because it contradicts the ICA's mandate of arbitration. Plaintiffs' argument is basically that because there was a previous agreement, it necessarily stands alone and may contradict the ICA on the issue of arbitration. But this is not the case. An implied contract cannot override the same subject matter in an express contract. *Ward,* 208 F.Supp.2d at 437 ("A contract cannot be implied in fact where there is an express contract covering the subject matter involved ...") (internal quotation marks omitted). Because the ICA covers the same subject matter (i.e., dispute resolution), a previous implied-in-fact contract cannot provide the basis for Plaintiffs' argument for jurisdiction in federal court.[7] Plaintiffs' third-party beneficiary claim

---

7. Even if the oral contract was made and there was some way around the arbitration clause, Plaintiffs fail to produce any evidence that this contract required adjudication in federal court. Plaintiffs offers deposition testimony, in support of its point, that DePompo/A–O and Isham/Gladius must have had a previous agreement because the ICA does not specify that there was an oral agreement to provide guards (PX48 at 57:13–18); that DePompo would receive a $5 coordination fee;

or that Gladius contracted for the provision of armed security guards (PX46 at 64:14–65:12). These submissions evince nothing more than the fact that Gladius and A–O established other terms through the course of performance of the contract. They do not establish the further—and necessary—point that Gladius and A–O's previous implied-in-fact contract required resolution in federal court, let alone in federal court in New York.

against Gladius must be heard in arbitration. Because Plaintiffs' successor-in-interest claim against Centuria is only based on the theory that Gladius (and, thus, Centuria) is liable to Plaintiffs as a third-party beneficiary, it too must be decided in arbitration.

Having determined that arbitration is proper, whether Plaintiffs' claims against Centuria or Gladius are viable ones and the applicable law for such determinations is within the province of the arbitrator. *John Wiley & Sons v. Livingston,* 376 U.S. 543, 557, 84 S.Ct. 909 11 L.Ed.2d 898 (1964) ("Once it has been determined ... that the parties are obligated to submit the subject matter of a dispute to arbitration, 'procedural' questions which grow out of the dispute and bear on its final disposition should be left to the arbitrator."). Plaintiffs' motion for summary judgment on third-party beneficiary status and class certification is necessarily denied because these issues will be decided in arbitration.

### D. Summary Judgment Against A–O

■ Gladius seeks summary judgment of A–O's claims because the entity is not represented by counsel. It is well-settled that a corporation cannot appear pro se in federal court unless represented by a licensed attorney. *Rowland v. California Men's Colony,* 506 U.S. 194, 202, 113 S.Ct. 716, 121 L.Ed.2d 656 (1993) ("[S]ave in a few aberrant cases, the lower courts have uniformly held that 28 U.S.C. § 1654 ... does not allow corporations, partnerships, or associations to appear in federal court otherwise than by licensed counsel."); *Dow Chem. Pac. Ltd. v. Rascator Maritime, S.A.,* 782 F.2d 329, 336 (2d Cir.1986). Because A–O's claims are not properly before this court since A–O may not appear without an attorney, A–O's cross-claims against Gladius are dismissed without prejudice. *See Memon v. Allied Domecq QSR,* 385 F.3d 871, 873–74 (5th Cir.

2004) (noting that dismissal with prejudice is an extreme sanction that deprives a litigant of the opportunity to pursue his claim).

■ Gladius also seeks summary judgment in its cross-claims against A–O. This issue, however, is less clear. Procedurally, having determined that jurisdiction does not lie with this Court pursuant to the ICA, it is unclear if default judgment may be entered against A–O. Default judgment is generally available when a corporation appears pro se. *City of New York v. Mickalis Pawn Shop, LLC,* 645 F.3d 114, 130 (2d Cir.2011) (citing, *inter alia, Shapiro, Bernstein & Co. v. Continental Record Co.,* 386 F.2d 426, 427 (2d Cir.1967) (reversing and remanding to district court for entry of default judgment against corporation not represented by duly admitted counsel)). But just as Plaintiffs must seek relief in the Texas arbitration for their claims relating to the ICA, Gladius is similarly limited.

■ If the Court does not have jurisdiction to hear Plaintiffs' claims because they are related to the ICA, neither may it determine Gladius's breach of contract, unjust enrichment, fraud and business disparagement claims against A–O, which all cite the ICA as substantial support. Thus, this Court does not decide Gladius's claims against the A–O Defendants stemming from their alleged breach of contract. Gladius's claims against the A–O Defendants to the extent they arise out of or relate to the ICA are properly settled in the Texas arbitration.

This Court's previous grant of partial civil judgment for Plaintiffs against A–O, (*see* Dkt. No. 139), was not improper because Plaintiffs ostensibly had a separate agreement with A–O that was not the ICA nor implicated by the ICA. Neither A–O nor Plaintiffs alleged that their agreement was subject to arbitration. Thus, the

Court properly decided the issue of A–O's liability to Plaintiffs. *See Travelers Inc. v. GE Capital Mortg. Corp.*, 211 A.D.2d 522, 523, 621 N.Y.S.2d 562, 563 (N.Y.App.Div. 1995) ("Arbitration will only be compelled where the parties have expressly agreed to arbitrate in clear and unequivocal language and will not be directed where arbitration is sought by implication.").

## CONCLUSION

AT & T's motion for summary judgment dismissing Plaintiffs' FLSA and NYLL claims (Dkt. No, 165) is GRANTED. AT & T's motion to dismiss Plaintiffs' NYLL claims on jurisdictional grounds (Dkt. No. 165) is DENIED as moot.

Gladius and Centuria's motions to compel arbitration and dismiss the complaint (Dkt. Nos. 169, 171) are GRANTED. Gladius's cross-motions for summary judgment against the A–O Defendants and against Plaintiffs are DENIED as these claims will be decided in arbitration. A–O's cross-claims against Gladius are dismissed without prejudice.

As to their third-party beneficiary status and successor-in-interest liability claims against Gladius and Centuria, respectively, Plaintiffs' motions for summary judgment against Gladius and Centuria (Dkt. No. 150) are DENIED as these claims will be decided in arbitration. Plaintiffs' motion for summary judgment against AT & T is DENIED. Plaintiffs' motion for class certification as to AT & T, Gladius and Centuria is DENIED as moot. If desired, Plaintiffs may renew their motion for class certification and motion for summary judgment for classwide damages against Grace DePompo in her individual capacity, upon proof of service.

SO ORDERED.